**Frank BATTEN and Jane P. Batten, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. A. No. 134–70–N.**

United States District Court,
E. D. Virginia,
Norfolk Division.

Jan. 11, 1971.

———◆———

T. Howard Spainhour, Kaufman, Oberndorfer & Spainhour, Norfolk, Va., for plaintiffs.

Helen E. Marmoll, Tax Division, Dept. of Justice, Washington, D. C., for defendant.

## OPINION

KELLAM, District Judge.

Frank Batten and Jane P. Batten, husband and wife, seek to recover federal income taxes and interest assessed to and paid by them for the taxable calendar years 1965 and 1966 aggregating some $7,000.00. The sole issue is whether plaintiffs are entitled to an income tax deduction for interest paid on an obligation of Frank Batten (Batten) while owning and holding tax-exempt obligations. The determination of this issue involves Section 265 of the Internal Revenue Code, which, to the extent here pertinent, provides:

No deduction shall be allowed for—

(1) Expenses.—Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest  *  *  * wholly exempt from the taxes imposed by this subtitle  *  *  *.

(2) Interest.—Interest on indebtedness incurred or continued to purchase or carry obligations  *  *  * the interest on which is wholly exempt from the taxes imposed by this subtitle.

Prior to his death late in 1959, Colonel S. L. Slover (Slover) was chairman of the board and chief executive officer of Norfolk Newspapers, Inc., which published the Virginian-Pilot, a morning newspaper, and the Ledger-Dispatch, an afternoon newspaper, in the Norfolk area. He was the principal, if not the sole, stockholder of Ledger-Dispatch Corporation, which owned two-thirds of the Norfolk Newspaper stock, and numerous other assets. By gift he transferred 2500 shares of stock in Ledger-Dispatch Corporation (Ledger) to Batten. In 1956 Slover and Batten entered into a written agreement providing that if Batten outlived Slover, Batten was obligated to purchase from Slover's estate voting trust certificates representing 1600 shares of common stock of Ledger at a price of $175.00 per share, and 227⅓ shares of common stock of Norfolk Newspapers, Inc. at $250.00 per share. The agreement provided that settlement should be made within six months following the death of Slover, by payment of not less than twenty-five per cent of the purchase price in cash, with the balance evidenced by a note or notes of Batten payable in not more than ten equal annual installments, bearing interest at four per centum per annum, with right of anticipation in whole or in part.[1] Pursuant to the agreement, on May 3, 1960, Batten consummated the purchase by a cash payment of some $116,000.00 [2] and execution of a note for

1. With Slover's approval, Batten assigned to Charles L. Kaufman the right to purchase 150 of the 227⅓ shares of Norfolk Newspapers, Inc., which right Kaufman exercised.

2. $37,500.00 received from assignment to Kaufman of right to purchase some of the stock.

$220,000.00, to bear interest at four per centum per annum. It is the deduction or charging of interest paid on this note as an expense which is here at issue.

Prior to his purchase of the stock from Slover's estate, Batten owned over $400,000.00 worth of stock in Ledger, and $63,000.00 in tax-exempts. He had $96,000.00 in his checking account (the majority of which was used as the cash payment toward the purchase of Slover's 1600 shares of Ledger); he owned oceanfront real estate conservatively valued at $360,000.00;[3] he owned a home valued at $48,000.00, on which there was a $13,000.00 mortgage; and he owned common stocks and United States Treasury Bonds valued at approximately $125,000.00. His liability was the small mortgage on his home. Tax-exempt bonds constituted less than 6% of his total assets. In the face of these undisputed facts, it is the government's contention that Batten's liquid assets in 1960 were such that he was actually forced to tender his note to his uncle's estate to enable him to complete his purchase of the Ledger stock. The government arrives at this conclusion by asserting that had Batten paid the full amount of the stock purchase in cash in 1960, it would have been necessary for him to have sold his tax-exempt bonds.

■ Beyond this bare contention the government has not presented evidence to show a purposive connection between Batten's assuming the liability of $220,000.00 in 1960 and his holding his tax-exempt bonds. The showing of a purposive connection has been a requirement, however, in actions involving § 265(2) since the enactment of the original statute in 1917. The section is not to be applied mechanically, as its legislative history clearly indicates.

■ The contract between Batten and Slover was made in 1956, four years before the note was given and the obligation incurred, and nine years before the

tax-exempt income involved here came into being. The purpose of § 265(2) is not to convert tax-exempt interest into taxable income, but to prevent interest deductions arising out of transactions which have no substance other than tax avoidance.

■ As we pointed out in Norfolk Shipbuilding and Drydock Corporation v. United States,[4] 321 F.Supp. 222, Section 265(2) does not necessarily or automatically disallow an interest deduction merely because a taxpayer owned tax-exempt securities while the indebtedness was outstanding. Wisconsin Cheeseman, Inc. v. United States, 388 F.2d 420 (7th Cir. 1967); Edmund F. Ball, 54 T.C. No. 114 (1970). Before the tax deduction is disallowed, there must be a direct relationship between the indebtedness and the tax-exempt securities. Leslie v. Commissioner of Internal Revenue, 413 F.2d 636 (2d Cir. 1969); Illinois Terminal R. R. Co. v. United States, 375 F.2d 1016, 179 Ct.Cl. 674 (1967).

■ In the *Norfolk Shipbuilding case* we set out the history of the Act. It would serve no good purpose to here again set it forth. Suffice it to say that the history makes it clear that Congress intended that interest deductions should not be disallowed unless there is a purpose to obtain a double tax benefit. As the Board of Tax Appeals pointed out in R. B. George Machinery Co. v. Commissioner of Internal Revenue, 26 BTA 594 (1932), the Act was not "intended to penalize legitimate business or to deny it the right to deduct interest paid for borrowed money, which money was used for the purpose of carrying on its regular functions." By no stretching of the facts of this case can we say that the indebtedness in question was "incurred or continued to purchase or carry [tax-exempt] obligations."

The government contends that Batten did not have sufficient liquid assets to continue holding his tax-exempt bonds

---

3. This same property has been sold within the last year for an amount in excess of $1,000,000.00.

4. The opinion in that case was written prior to a hearing and filing of briefs in this case.

and at the same time anticipate or pay the note owed to his uncle's estate. There can be no doubt from the evidence that Batten did have sufficient liquid assets with which to anticipate the note. By the very terms of the contract he was given six full months in which to perform the original contract. This was more than enough time for him to have sold all or a portion of his real estate holdings had he so desired, re-mortgaged his home, or drawn upon the extensive borrowing power from his banking connections, trust funds established for him, or within his own family.[5] The timing involved here is not at all similar to that in the recent cases where Section 265(2) has been held applicable. *See*, Illinois Terminal Railroad Co. v. United States, 375 F.2d 1016, 179 Ct.Cl. 674 (1967); Wisconsin Cheeseman, Inc. v. United States, 388 F.2d 420 (7th Cir. 1967). The facts here resemble those of Ball v. Commissioner, 54 T.C. No. 114, decided June 4, 1970. In *Ball*, the Court examined each of Mr. Ball's debts and found that each of them was incurred in an attempt to create a profitable investment and that there was no relationship between the incurring of the several debts and the holding of tax-exempt securities. There, as here, the percentage of the taxpayer's assets that had been invested in tax-exempt securities, while necessarily not dispositive of the issue, helped shed light on whether the debt had been incurred solely from the point of view of avoiding taxes.

In Leslie v. Commissioner of Internal Revenue, 413 F.2d 636 (2d Cir. 1969), the Court stated that "[an] appropriate interpretation of Section 265(2) is whether or not there is a business 'purpose' to purchase or carry obligations the interest on which is exempt, and to incur indebtedness therefor." *Ibid.* at

640. The same test was also inherent in *Illinois Terminal*, where the Court weighed the business reasons for carrying the tax-exempt securities and there concluded that favorable tax aspects dominated the decision not to sell the securities.

Here the interest rate on the ten-year debt was only four per cent. With such a low rate of interest, it would have been unwise from a strictly non-tax business point of view for plaintiffs to have anticipated the debt. That plaintiffs could have anticipated the debt is easily revealed by a cursory glance at plaintiffs' income tax returns for 1965 and 1966. In either year, plaintiffs' income after taxes would have been sufficient to have anticipated the debt remaining. Batten, in fact, received sufficient monies during these years from the proceeds of a single trust fund for his benefit to have paid the debt.

■ The evidence does not show the purposive intent required by Congress, namely, to create a tax-exempt income or obtain a double tax benefit. To the contrary, the evidence establishes there was no relationship between the indebtedness and the tax-exempt securities. Hence, Section 265(2) does not apply here, and the interest paid by the taxpayer on his indebtedness is fully deductible. Plaintiffs will recover the amount of the tax assessed and paid, together with the legal interest thereon.

Counsel will within twenty days submit an appropriate order on judgment. If they are unable to agree on the exact amount of the judgment, or the form of the order, each should within said twenty days submit a form of proposed order, together with a memorandum of their contentions, for a ruling by the Court.

5. It was stated in testimony that he could have obtained almost any amount of money from his aunt, Mrs. Fay Martin Slover, who at her death left an estate conservatively estimated in excess of $10,-000,000.00. In addition, he was beneficiary in the Frank Batten Trust from which he received substantial income, and was on the board of the largest bank in the area, and a beneficiary in other trusts.