**Max R. ISRAELSON and Bernice Israelson**
v.
**UNITED STATES of America.**
**Civ. No. 72–948–T.**

United States District Court,
D. Maryland.
Dec. 7, 1973.

---

1. On defendants' theory a member could conceivably allocate the entire amount of his dues to the Political Fund thereby paying no dues at all.

Marvin J. Garbis, Baltimore, Md. (Allen L. Schwait and Garbis & Schwait, Baltimore, Md., on the brief), for plaintiffs.

Edward J. Snyder, Atty., Dept. of Justice (Scott P. Crampton, Asst. Atty. Gen., and David A. Wilson, Jr., Atty. Dept. of Justice, Washington, D. C., on the brief), for defendant.

THOMSEN, District Judge.

Plaintiffs seek to recover $5,925.33 of federal income taxes paid as a deficiency for 1967 and $1,371.63 of interest paid with that deficiency.[1] Bernice Israelson is a party to the action only because she filed a joint federal tax return with her husband, Max R. Israelson.

I

The principal question presented is whether $16,308.92 out of a total of $21,155.00 of interest expense claimed by the plaintiffs for 1967 was properly disallowed by the Internal Revenue Service under the provisions of section 265,

---

1. Plaintiffs originally claimed a larger amount, but a number of disputes have been resolved or will be adjusted after the decision of the questions covered by this opinion, along with a determination of any amount of interest plaintiffs may be entitled to recover.

Internal Revenue Code of 1954, which provides:

"No deduction shall be allowed for —

"\* \* \* \* \* \*

"(2) Interest.—Interest on indebtedness incurred or continued to purchase or carry obligations \* \* \* the interest on which is wholly exempt from the taxes imposed by this subtitle. \* \* \*"

Max R. Israelson (hereinafter Taxpayer) practices law in Baltimore. In 1965 he received a substantial profit from a real estate venture. He consulted highly competent investment counsel, who advised him to diversify his investments and to keep or place about one-third in stocks, one-third in tax-exempt bonds and one-third in real estate. Taxpayer followed that advice.

By January 1, 1967, Taxpayer owned tax-exempt bonds with a total cost of $360,000,[2] of which $220,000 had been purchased in 1965 and 1966, the others earlier. During 1967 he sold two lots of such bonds for $29,000, and in their place purchased two lots for $30,000. Nothing except his investment philosophy prevented his selling his tax-exempt bonds at any time.

During the years 1964–1967, a joint venture of which Taxpayer was one of two members purchased nine parcels of real estate near Riverhead, Long Island, with the intention of assembling a large tract to be sold in one or more sizeable units. Two other joint ventures in which Taxpayer participated had purchased two neighboring parcels of Florida real estate in 1962 and 1965. In each case a purchase money mortgage was given, as well as a substantial amount of cash. Most of the property is still held by the respective joint ventures, although some of the Long Island property has been sold.

For some years before 1965 Taxpayer had carried a substantial loan at the First National Bank. At one point, in July 1965, he paid off that loan, but shortly thereafter began to borrow

again. The balance due on the loan was $230,000 during most of 1966, and during 1967 ran between $136,000 and $384,000, with a closing balance of $276,000, and an average monthly balance of $254,000. More than two-thirds of the borrowings in 1967 were used to purchase stocks and taxable bonds; most of the rest was used for investment in real estate; a small proportion was used for charitable contributions, personal and business purposes; none was used to purchase tax-exempt bonds. The collateral securing the loan was always stock or taxable bonds, never tax-exempt bonds.

The Government concedes that the interest paid on the bank loan and on the mortgages was not interest on indebtedness *incurred* to *purchase* the tax-exempt bonds, but argues that the interest on the bank loan and on the mortgages was interest on indebtedness *incurred or continued* to *carry* the tax-exempt bonds.

The applicable legal principles are set out and discussed in: Illinois Terminal Railroad Company v. United States, 375 F.2d 1016, 179 Ct.Cl. 674 (1967); Wisconsin Cheeseman, Inc. v. United States, 388 F.2d 420 (7 Cir. 1968); Phipps v. United States, 414 F.2d 1366, 188 Ct.Cl. 531 (1969); Leslie v. Commissioner of Internal Revenue, 413 F.2d 636 (2 Cir. 1969), cert. den., 396 U.S. 1007, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970); Bishop v. C. I. R., 342 F.2d 757 (6 Cir. 1965); Ball v. Commissioner, 54 T.C. 1200 (1970); Indian Trail Trading Post v. Commissioner, 60 T.C. 497 (1973); Mariorenzi v. Commissioner, 32 T.C.M. 681 (June 28, 1973); Norfolk Shipbuilding & Drydock Corp. v. United States, 321 F.Supp. 222 (E.D.Va.1971); Batten v. United States, 322 F.Supp. 629 (E.D. Va.1971).

The following principles are well established. Section 265(2) does not become operative merely because the taxpayer incurred or continued indebtedness at the same time that he held tax-exempt securities. Rather, the Commis-

2. All figures will be rounded.

sioner must establish a sufficiently direct relationship between the debt and the carrying of the tax-exempt bonds. The touchstone for decision is the *purpose* of the taxpayer in incurring or continuing the indebtedness. A finding of a taxpayer's purpose does not depend solely upon looking into his mind and learning what he was thinking; although his intentions are relevant, his purpose may be inferred from his conduct and from the circumstances that confronted him. The taxpayer has the burden of overcoming the presumption of validity of the Commissioner's determination of deficiencies.

In applying those principles to the facts of this case, the Court will consider separately the interest paid by Taxpayer (A) on the bank loan, and (B) on the purchase money mortgages.

■ (A) The average amount outstanding on the bank loan during 1967 ($254,000) was appreciably less than the amount of tax-exempt bonds held by Taxpayer during that year ($360,000). For only two months did the amount of the loan exceed $360,000, and then only by a maximum excess of $25,000. He could have avoided borrowing any money from the bank, except such excess for two months, by selling his tax-exempt bonds. The ownership of tax-exempt securities and the maintenance of the bank loan were parts of Taxpayer's investment plan. The fact that his investment counselor had advised him to invest about one-third of his portfolio in tax-exempt bonds cannot insulate Taxpayer from the effect of his deliberate decision to incur and maintain a large bank loan primarily for the purchase of securities, and to continue to hold a large amount of tax-exempt bonds, hoping to achieve the obvious tax advantages. This case is clearly distinguishable from such cases as *Ball* and *Batten,* supra.[3]

With respect to the interest paid on the bank loan, Taxpayer has failed to meet the burden resting on him. The Court finds and concludes that the interest paid in 1967 on the bank loan (except interest on $25,000 for two months) was interest on indebtedness purposefully incurred or continued to carry the tax-exempt bonds.

■ (B) There was a business reason for giving purchase money mortgages as part of the payment for the various parcels of real estate. Such mortgages are a customary method of financing such purchases, if not *the* customary method. Moreover, although Taxpayer engaged in the real estate transactions as an investor, in each instance he was a member of a joint venture and necessarily considered the desires of his fellow venturers as to how the respective purchases should be financed. The Court finds and concludes that the purpose of giving the purchase money mortgages was not to enable Taxpayer to carry the tax-exempt bonds. The interest paid by Taxpayer on those mortgages was therefore deductible.

II

■ Taxpayer seeks to deduct as an ordinary and necessary business expense[4] $1,055.00 of the $2,111.00 cost of a party at a country club, attended by 154 persons, mostly husbands and wives. His evidence, however, fails to meet the test established by section 274(a), I.R.C.1954, and elaborated in § 1.274–2(c), Income Tax Regs. The controlling principles are discussed in Andress v. Commissioner, 51 T.C. 863 (1969), aff'd 423 F.2d 679 (5 Cir. 1970).

3. In each of those cases the percentage of the taxpayer's assets invested in tax-exempt securities was quite small. In *Batten,* Judge Kellam said: "In *Ball,* the Court examined each of Mr. Ball's debts and found that each of them was incurred in an attempt to create a profitable investment and that there was no relationship between the incurring of the several debts and the holding of tax-exempt securities. There, as here, the percentage of the taxpayer's assets that had been invested in tax-exempt securities, while necessarily not dispositive of the issue, helped shed light on whether the debt had been incurred solely from the point of view of avoiding taxes." 322 F.Supp. at 632.

4. Under section 162, I.R.C.1954.

Although some clients, persons who refer clients, and other business associates were present, no business was discussed. The requirement of Reg. § 1.274–2(c)(3)(ii) is therefore not met. Moreover, the requirement of (iii) is not met.[5] In order to rely on (c)(3), all of its subsections must be met. Taxpayer does not contend that the requirements of (c)(4), (5) or (6) are met.

Taxpayer's further argument, that a similar deduction for a previous year was allowed by the I.R.S., cannot prevail. Automobile Club v. Commissioner of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); Nowland v. Commissioner of Internal Revenue, 244 F.2d 450 (4 Cir. 1957); Wiles v. United States, 312 F.2d 574 (10 Cir. 1962).

The claimed deduction must be disallowed.

### Conclusion

Counsel will agree upon a judgment giving effect to these rulings.

---

5. As the Court said in *Andress*, supra, 51 T.C. at 869, quoting from S.Rept. No. 1881, 87th Cong., 2d Sess., U.S.Code Cong. & Admin.News (1962), p. 3331: " '[W]here good- will generated by the expense is vague or where the possibility of the expenditure resulting in the production of income is remote, no deduction will be permitted'."