*Decision will be entered for the petitioners.*

HANDY BUTTON MACHINE CO., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3940–71, 3941–71, 7170–71, 7171–71. Filed March 27, 1974.

*Charles W. Davis, Douglas L. Barnes, Morris Glasser,* and *Samuel H. Horne,* for the petitioners.

*Lewis M. Porter, Jr.,* for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioners' income taxes as follows:

| Petitioner | TYE | Amount |
|---|---|---|
| Handy Button Machine Co | Nov. 30, 1966 | $40, 266. 86 |
| | Nov. 30, 1967 | 32, 994. 96 |
| | Nov. 30, 1968 | 27, 125. 34 |
| | Nov. 30, 1969 | 14, 788. 91 |
| Handy Realty Co | Sept. 30, 1966 | 7, 429. 58 |
| | Sept. 30, 1967 | 3, 591. 93 |
| | Sept. 30, 1968 | 4, 284. 02 |
| | Sept. 30, 1969 | 3, 310. 92 |

[1] Cases of the following petitioners are consolidated herewith: Handy Realty Company, docket No. 3941–71; Handy Button Machine Co., docket No. 7170–71; and Handy Realty Company, docket No. 7171–71.

The only issue for our decision is whether petitioners incurred or continued to carry indebtedness in order to purchase or carry tax-exempt municipal obligations within the meaning of section 265(2).[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulations of facts and attached exhibits are incorporated herein by this reference.

Petitioner Handy Button Machine Co. (hereinafter Button) had its principal office and manufacturing plant in Chicago, Ill., at the time it filed its petitions herein. At all times pertinent hereto, Button has been engaged in the manufacture and sale of button machines, metal buttons, mounting cups for the aerosol industry, and other metal-stamping specialty items.

Petitioner Handy Realty Co. (hereinafter Realty) had its principal office in Chicago, Ill., at the time it filed its petitions herein. Realty owns the factory buildings that house Button's manufacturing operations and several other tenants. Button paid rent to Realty throughout the years in question.

For the taxable years ended 1966, 1967, 1968, and 1969,[3] both Button and Realty filed their tax returns with the district director of internal revenue in Chicago.

Prior to 1970, Handy Button Machine Co. of New York, Inc. (Button of New York), operated a business similar to that of Button, generally confining its sales activities to the Eastern United States.

Prior to October 29, 1965, Button had outstanding 9,582 shares of $100 par value common stock and 6,427 shares of $100 par value 6-percent cumulative preferred stock, both classes of which were held by five family groups.

The persons named below as heads of family groups are all related as siblings and are all children of Morris Perlman, a cofounder of the business. The stock of Button is held by the following family groups:

|  | Percentage interest |
| --- | --- |
| Nathan Perlman | 24.20 |
| Joseph Perlman | 23.61 |
| Harold Perlman | 23.61 |
| Ethel Marmor | 14.99 |
| Reva Baritz | 13.59 |
| Total | 100.00 |

[2] Unless otherwise specified, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.

[3] The taxable years of the petitioners will be denoted by the calendar years in which they end. Button's taxable year ended on Nov. 30 and Realty's on Sept. 30, for each of the years involved.

Prior to October 29, 1965, Realty had outstanding 10,000 shares of $10 par value common stock owned by these same shareholders in approximately the same proportion as they owned the stock of Button.

From about 1935 until 1965, Joseph and Nathan were the two principal executives of Button and Realty and their titles (president and chairman of the board) often shifted between them during this time. Despite their close business and family relationships, Joseph and Nathan carried on a personal feud and found it impossible to deal or even speak with each other. Harold, a director of both Button and Realty, was forced into a constant role as mediator and peacemaker.

Nathan's desire to retire, and serious disagreements between Nathan and Joseph, on one hand, and various members of the boards and executives of Button, Realty, and Button of New York, on the other hand, over running the business and financial policy culminated in November 1964 in a decision by Nathan to sell all his interests in the business. On October 29, 1965, Button purchased, pursuant to an agreement with the members of Nathan's family group, 2,319 shares of their Button common stock for $1,446,284.02 and their 1,546 shares of Button preferred stock for $170,060. Button also purchased their 1,897 shares of the common stock of Button of New York for $235,128.98. Button's total obligation was $1,851,473, paid to the sellers as follows: $437,158 in cash on the closing date and the balance in six annual installments evidenced by Button's unsecured promissory notes bearing interest at 6 percent per annum on the unpaid balance. Also on October 29, 1965, Realty purchased, pursuant to an agreement, the 2,419.7 shares of its common stock held by the members of Nathan's family for $266,167. Under this agreement, Realty paid $62,842 to the sellers on the closing date and the balance in six annual installments evidenced by Realty's unsecured promissory notes bearing interest at 6 percent per annum. Except for the terms of payment, both the Button and Realty purchase agreements were substantially identical. Each note provided that the payor (Button or Realty) could, on at least 30 days' notice to the sellers, any time after January 4, 1966, prepay, without penalty or premium, all or any portion of the principal balance remaining unpaid at the time. On December 27, 1965, Button and Realty retired all their respective shares acquired from the selling shareholders.

Each agreement contained detailed provisions designed to assure the financial capabilities of Button and Realty to meet their installment notes and contained a maintenance of net working capital requirement of $2,471,035 minus sums paid on account of principal of the notes in the case of Button and $213,443 minus such sums paid in the case of Realty. Net working capital was defined as follows:

For the purposes hereof, "net working capital" of BUYER shall mean the excess of its current assets over its current liabilities computed in accordance with generally accepted principles of accounting consistently applied; provided, however, that current liabilities shall not include any unpaid principal of any of the NOTES, and current assets shall include, but not be limited to, the fair market value of all certificates of deposit, municipal bonds, commercial paper, commercial notes, obligations· of the United States, treasury bills, treasury notes and such other evidences of indebtedness (including that portion of any evidences of indebtedness of NEW YORK and/or REALTY payable within one year from the date of determination) and all marketable securities and short-term investments;

In addition, a restriction against the sale of assets other than in the ordinary course of business was included in the agreement, but the sale of various types of securities (including municipal bonds) was excluded from this restriction.

To make the initial payments, petitioners relied primarily on the proceeds of maturing municipal bonds they held.

Button's business grew and prospered during the years 1935 to 1965, when Nathan and Joseph were its two managing officers, into one of the world's largest producers of metal button parts. With this growth came serious physical and financial problems. The physical problems involved a manufacturing plant which required extensive expansion and renovation to meet Button's growing needs. The board of directors made numerous investigations into the acquisition of new companies and new plant locations. The estimated cost of acquisition, construction, or renovation of the plant was in excess of $2 million. In addition, the machinery and equipment was in extremely poor condition and the cost of replacement was estimated to be between $1 million and $2 million. Despite these needs, the reign of Joseph and Nathan was marked by an extremely conservative fiscal policy. Under this policy, no money was ever borrowed by Button and comparatively little was ever spent for replacements and additions to fixed assets. From 1963 through 1966, $415,034.94 was spent for such purposes, while the amount spent from 1967 through 1971 was $3,079,752.55 under the leadership of Leonard Baritz, who became president of Button and treasurer of Realty on December 1, 1966.

In the years prior to 1966, and as an outgrowth of their conservative spending policy, the inability of Nathan and Joseph to agree, and their knowledge of the great needs of the business, Nathan, who was in charge of finances, caused petitioners to acquire large amounts of both taxable and tax-exempt securities.

The year-by-year investments in municipals and other pertinent information is shown in the following tables:

## TABLE 1
### HANDY BUTTON

| Year | Investments in municipal bonds (amortized cost) | Exempt income derived from municipal bonds [1] | Balance due on all installment notes to former shareholders | Deduction claimed for interest payments on installment notes | Interest deductions disallowed by respondent in this proceeding |
|---|---|---|---|---|---|
| *Nov. 30—* | | | | | |
| 1954 | $292,000.00 | ---------- | 0 | 0 | 0 |
| 1955 | 520,000.00 | ---------- | 0 | 0 | 0 |
| 1956 | 501,000.00 | ---------- | 0 | 0 | 0 |
| 1957 | 653,000.00 | ---------- | 0 | 0 | 0 |
| 1958 | 819,000.00 | ---------- | 0 | 0 | 0 |
| 1959 | 1,139,000.00 | ---------- | 0 | 0 | 0 |
| 1960 | 936,000.00 | ---------- | 0 | 0 | 0 |
| 1961 | 1,375,000.00 | ---------- | 0 | 0 | 0 |
| 1962 | [2] 1,171,000.00 | ---------- | 0 | 0 | 0 |
| 1963 | 1,257,219.45 | $24,226.16 | 0 | 0 | 0 |
| 1964 | 1,320,059.93 | 26,569.38 | 0 | 0 | 0 |
| 1965 | 841,099.70 | 21,976.61 | $1,414,315.00 | 0 | 0 |
| 1966 | 1,717,304.81 | 45,584.54 | 1,178,597.53 | $83,861.59 | $83,889.29 |
| 1967 | 1,232,649.38 | 42,579.82 | 893,201.02 | 67,218.68 | 68,739.49 |
| 1968 | 638,759.96 | 35,397.07 | 607,804.51 | 49,835.68 | 51,772.37 |
| 1969 | 74,577.00 | 15,834.09 | 322,408.00 | 32,836.10 | [3] 28,009.24 |
| 1970 | 0 | 2,384.38 | 37,011.49 | 16,196.91 | 0 |
| 1971 | 0 | 0 | 0 | 1,801.30 | 0 |

[1] The record is silent on exempt income derived from municipal bonds from 1954–63.
[2] The figures for 1954 to 1962 have been rounded off by the parties in the stipulations.
[3] Respondent has conceded that he erred in stipulating the figures in this column. He now agrees that the maximum disallowance should not be in excess of the deduction claimed for interest payments on the installment notes.

## TABLE 2
### HANDY REALTY

| Year | Investments in municipal bonds (amortized cost) | Exempt income derived from municipal bonds [1] | Balance due on all installment notes to former shareholders | Deduction claimed for interest payments on installment notes |
|---|---|---|---|---|
| *Sept. 30—* | | | | |
| 1957 | $30,174.03 | ---------- | 0 | 0 |
| 1958 | 30,034.42 | ---------- | 0 | 0 |
| 1959 | | ---------- | 0 | 0 |
| 1960 | | ---------- | 0 | 0 |
| 1961 | 180,864.14 | ---------- | 0 | 0 |
| 1962 | 153,010.54 | ---------- | 0 | 0 |
| 1963 | 254,327.10 | ---------- | 0 | 0 |
| 1964 | 287,865.28 | ---------- | 0 | 0 |
| 1965 | 140,760.66 | ---------- | 0 | 0 |
| 10/29/65 | | | $203,325 | 0 |
| 1966 | 247,544.91 | $6,208.53 | 203,325 | $13,221.76 |
| 1967 | 220,027.80 | 6,842.13 | 169,446 | 10,336.18 |
| 1968 | 302,906.56 | 9,101.34 | 135,567 | 8,303.42 |
| 1969 | 163,908.34 | 6,701.00 | 101,688 | 6,270.67 |
| 1970 | 168,844.50 | 5,733.59 | 67,809 | 4,237.93 |
| 1971 | 46,241.50 | 3,743.75 | 33,879 | 2,205.17 |

[1] The record is silent on exempt income derived from municipal bonds from 1957 to 1966.

The increase in Button's municipal holdings which occurred in 1966 is substantially due to the fact that Button collected a "Commercial Note Receivable" of $750,000 in early 1966 and the proceeds were used to purchase municipals. The reduction in Button's municipal bond holdings from 1966 to 1971 was due to the large expenditures made in

the modernization program. As Realty's tax-exempt bonds became due in the years 1966 to 1971, it collected the proceeds and loaned the money to Button to purchase new equipment.[4]

## ULTIMATE FINDING OF FACT

Petitioners did not have the purpose of incurring or continuing an indebtedness to purchase or carry tax-exempt obligations within the meaning of section 265(2).

## OPINION

The factual frame of reference of this case can be simply stated. Because of bona fide disputes among various stockholder interests, petitioners redeemed certain of their shares of stock and paid a substantial part of the purchase price in 6-year installment notes, bearing interest at 6 percent. At the time of the redemptions, petitioners owned large amounts of tax-exempt obligations which they acquired and were holding for established business needs—needs which could not be met because of the previously mentioned disputes. A portion of the obligations were sold to provide funds for the downpayment. Petioners utilized cash generated by subsequent earnings to replenish and increase their holdings of tax-exempt obligations, again to provide funds with which to meet established business needs. Those needs were in fact met in due course after the redemptions, through the liquidation of those obligations. The issue for decision is whether, under such circumstances, deductions for an allocable portion of the interest on the installment notes, during the taxable years in question, should be disallowed on the ground that the indebtedness represented by such notes was "incurred or continued to purchase or carry" tax-exempt obligations within the meaning of section 265(2).

The applicable legal principles can also be simply stated. The legal touchstone is the *purpose* of the taxpayer in incurring or continuing the indebtedness, and, in determining such purpose, we are not confined to the evaluation of evidence of subjective intent but may draw inferences from the conduct of the taxpayer and the circumstances surrounding the pertinent transactions. *Indian Trail Trading Post, Inc.*, 60 T.C. 497, 500 (1973), on appeal (C.A. 6, Nov. 19, 1973); *James C. Bradford*, 60 T.C. 253, 259–260 (1973); *John E. Leslie*, 50 T.C. 11, 20–21 (1968), reversed on other grounds 413 F. 2d 636 (C.A. 2, 1969).[5]

---

[4] The only evidence in the record relating to this loan is an item listed on the balance sheets of both corporations. In Button's long-term liabilities section, it is stated, "5% Note Payable to Handy Button Realty Company, Due October 1, 1973."

[5] The reversal was followed by this Court in *James C. Bradford*, 60 T.C. 253, 259–260 (1973).

This inference-drawing process has been expressed in terms of culling from the facts and circumstances "a sufficiently direct relationship" or a "purposive connection" between the incurring or continuing of the indebtedness and the acquisition or holding of the tax-exempt obligations. See *Israelson* v. *United States*, 367 F. Supp. 1104 (D. Md. 1973) ; *Batten* v. *United States*, 322 F. Supp. 629, 631 (E.D. Va. 1971); *Indian Trail Trading Post, Inc., supra*, and cases cited therein. Additionally, timing is considered an important element. Ibid. Finally, it is settled beyond argument that the simultaneous existence of an indebtedness and the holding of tax-exempt obligations is not, in and of itself, sufficient to trigger a disallowance under section 265(2). Ibid. Against the foregoing legal backdrop, we turn to an analysis of the "particular fact setting" of this case (see *Illinois Terminal Railroad Co.* v. *United States*, 375 F. 2d 1016, 1022 (Ct. Cl. 1967)), keeping in mind that petitioners have the burden of proving their sanitary purpose for incurring or carrying the indebtedness. *Wisconsin Cheeseman, Inc.* v. *United States*, 388 F. 2d 420, 423 (C.A. 7, 1968) ; *Indian Trail Trading Post, Inc., supra* at 500; Rule 142, Tax Court Rules of Practice and Procedure.

Initially, we note that respondent does not dispute the legitimacy of the business reasons for the redemption or for the acquisition of the tax-exempt obligations. Rather, respondent contends "that each petitioner's conduct together with the circumstances confronting it, at the time of the redemption and at the beginning of each succeeding year in question, demonstrates that *but for* the 'borrowing' each petitioner would have been required to sell its pre-existing tax-exempts and could not have acquired new ones." Respondent recognizes the insufficiency of the mechanical test (see above) and seeks to avoid the barrier of its rejection by a painstaking and skillful analysis of the working capital needs of petitioner's businesses and the impact of the net working capital requirement of the agreements pursuant to which the redemptions took place.

The first prong of respondent's argument consists of a projection of petitioners' recurring and nonrecurring needs and a matching of those needs against availabilities, as a result of which respondent concludes that: (1) Insufficient liquid assets (excluding the tax-exempts) were available to fund the redemptions; (2) therefore, it was necessary for petitioners to make a conscious choice either to finance the redemptions or sell their previously acquired tax-exempts; and (3) therefore, such financing represented an indebtedness incurred to carry tax-exempt obligations. But the fact of the matter is that petitioners' holdings at the time of the redemptions represented *previously acquired* tax-exempts, thus injecting into the instant situation the significant ele-

ment of timing. Cf. *Indian Trail Trading Post, Inc., supra.* In the context of this case, respondent's syllogism seems to us to amount to nothing more than saying that the rejected mechanical test should control the application of section 265 (2) Cf. *Batten* v. *United States, supra.*

With respect to the years subsequent to the year of redemptions, respondent indulges in the same working capital analysis to justify his argument that, because of the right to prepay the installment notes, petitioners must have made a similar conscious choice in each year in issue. Here again we conclude that, in the context of this case, respondent is advocating nothing more than the application of the rejected mechanical test. In so concluding, we have not overlooked the fact that, in *Illinois Terminal Railroad Co.* v. *United States, supra,* the Court of Claims found the proscribed purpose to exist where the taxpayer had a choice between liquidating tax-exempts in order to pay off an indebtedness or holding the tax-exempts and continuing the indebtedness, and chose the latter course. But, in that case, an extension or renewal of bank borrowings, which otherwise would have become due and payable, was involved. Cf. *Israelson* v. *United States, supra.* By way of contrast, what is involved herein is the mere right to prepayment by a debtor of an obligation of a type often subject to extended terms of payment. Cf. *Edmund F. Ball,* 54 T.C. 1200, 1209 (1970). In drawing the foregoing distinction, we do not mean to imply that in every case where there is a previously incurred term obligation, a finding of the proscribed purpose, deriving from the existence of a right of prepayment, will necessarily be precluded.

A similar analysis serves to distinguish *Wisconsin Cheeseman, Inc.* v. *United States, supra,* where the Seventh Circuit Court of Appeals emphasized, among other considerations, the fact that, at the time of purchasing the tax-exempts, the taxpayer could have reasonably foreseen that a loan would soon be required to meet its business needs. See 388 F. 2d at 422. Here there was no such foreseeable need to borrow. Indeed, at the time of the bulk of the acquisitions, the redemptions were not within the contemplation of the petitioners or their shareholders. What is more, petitioners' acquisition of tax-exempts had precisely the opposite effect, i.e., it obviated the need to borrow to meet anticipated business needs.

We recognize that, subsequent to the redemptions, petitioners used cash generated by earnings to replenish and increase their holdings of tax-exempts. But here again, this was done in the context of a long-established business purpose, antedating the redemptions, to put aside funds for business needs. Under the circumstances of this case, we think such action does not compel a finding that the proscribed purpose

existed. Our statement in *Indian Trail Trading Post, Inc.*, 60 T.C. at 502, that "business oriented reasons" in respect of tax-exempts may not be sufficient to negate the proscribed purpose does not dictate a contrary conclusion. That statement was carefully tailored to the facts of that case, where the original borrowing was nontainted but the excess funds from such borrowing could be *traced* to the purchase of the tax-exempts at a later date and, in any event, was carefully qualified by the phrase *"necessarily* justify." (Emphasis added.) Cf. *Israelson* v. *United States, supra; Kirchner, Moore & Co.*, 54 T.C. 940 (1970). Tracing the use of actual borrowed funds was also the key to our rejection of reimbursement for prior expenditures as a compelling reason for finding a nontainted purpose. See 60 T.C. at 501. In the same vein, the rejection of business purpose for the holding of tax-exempts in *Illinois Terminal Railroad Co.* v. *United States, supra*, was made in the context of what was in effect an original borrowing, i.e., renewal or extension of an obligation about to become due and payable. Compare also *Levitt* v. *United States*, 368 F. Supp. 644 (S.D. Iowa 1974).

Finally, we must deal with the second prong of respondent's argument, namely, that the maintenance of the net working capital requirement of the redemption agreements in effect made the installment notes an indebtedness secured by the petitioners' tax-exempts. We see no purpose to be served by dissecting respondent's analysis. It is enough to observe that the tax-exempts were not in fact pledged to secure the installment notes and that petitioners were free to dispose of the tax-exempts at any time and to meet the net working capital requirement by other means.[6]

In sum, based upon "total impression given by the evidence" and recognizing that "In another case, the impression will be different" (see *Illinois Terminal Railroad Co.* v. *United States*, 375 F. 2d at 1022–1023; cf. *Mariorenzi* v. *Commissioner*, 490 F. 2d 92 (C.A. 1, 1974), affirming a Memorandum Opinion of this Court), we are satisfied that what is involved herein is far more than "merely juggling * * * so as to create a surface sanitation of the indebtedness" (see *Indian Trail Trading Post, Inc.*, 60 T.C. at 500). We conclude, therefore, as our ultimate finding of fact reveals, that petitioners did not have the proscribed purpose under section 265(2) of incurring or continuing the indebtedness to their former shareholders. In view of

---

[6] For the same reason, we see no necessity for this Court to resolve the question whether the pledge of previously acquired tax-exempts, in and of itself, requires the conclusion that the proscribed purpose existed. See *Wisconsin Cheeseman, Inc.* v. *United States*, 388 F. 2d 420 (C.A. 7, 1968) ; *Norfolk Shipbuilding & Drydock Corp.* v. *United States*, 321 F. Supp. 222, 230 (E.D. Va. 1971) ; cf. *Edmund F. Ball*, 54 T.C. 1200, 1209 (1970).

this conclusion, we need not reach the further questions as to the proper allocation formula (see Rev. Proc. 72–18, 1972–1 C.B. 740) or as to whether the word "indebtedness" in section 265(2) is limited to situations where an actual borrowing of funds takes place. See *R. B. George Machinery Co.*, 26 B.T.A. 594, 597 (1932).

*Decisions will be entered for the petitioners.*