EARL DROWN CORPORATION, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3350-82, 3351-82, 3352-82.    Filed February 24, 1986.

*James H. Knecht*, for the petitioners.
*Gregory A. Roth*, for the respondent.

STERRETT, *Chief Judge*: In these consolidated cases, respondent determined, by notices dated December 31, 1981, deficiencies in petitioners' Federal income taxes as follows:

---

[1] Cases of the following petitioners are consolidated herewith: Blanche Drown Corp., docket No. 3351-82; and Jack A. Drown and Helene C. Drown, docket No. 3352-82.

| Docket No. | Petitioner | Tax year ended | Deficiency |
|------------|------------|----------------|------------|
| 3350-82 | Earl Drown Corp. | 11/30/77 | $3,207 |
| | | 11/30/78 | 1,160 |
| 3351-82 | Blanche Drown Corp. | 11/30/77 | 3,257 |
| | | 11/30/78 | 1,172 |
| 3352-82 | Jack A. Drown and | 12/31/76 | 25,625 |
| | Helene C. Drown | 12/31/77 | 8,000 |

After concessions, the sole issue before the Court is whether the interest expense deducted by Drown News Agency for interest paid to the Drown Trust and to Drown Periodicals, Inc., was nondeductible interest paid on an "indebtedness incurred or continued to purchase or carry" tax-exempt securities pursuant to section 265(2), or deductible pursuant to section 163.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioner Earl Drown Corp. (hereinafter EDC) and petitioner Blanche Drown Corp. (hereinafter BDC) are California corporations and at all relevant times have had their principal places of business at 15172 Golden West Circle, Westminster, California. Petitioners Jack A. Drown and Helene C. Drown are husband and wife and at all relevant times resided in Rolling Hills, California. During the years in issue, EDC and BDC maintained their books and records and filed their corporate income tax returns under the cash method of accounting, and Jack A. and Helene C. Drown filed their joint Federal income tax returns under the cash method of accounting. All such income tax returns were filed with the Internal Revenue Service Center in Fresno, California.

During the years in issue, EDC, BDC, and Jack A. Drown were the general partners of Drown News Agency, a California general partnership (hereinafter DNA), and their

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue.

shares of partnership capital and profits and losses were 25 percent, 25 percent, and 50 percent, respectively. During this period, Jack A. Drown, Helene C. Drown, and Sara Samuelson, an employee of DNA, were the directors of EDC and BDC, and Jack A. Drown was president and Helene C. Drown was vice president of EDC and BDC. All of the issued and outstanding stock of EDC and BDC was, and continues to be, held by Jack A. Drown and Everett Morris, as trustees, under a Declaration of Trust executed on December 14, 1956, by Earl E. Drown and Blanche A. Drown, as trustors (hereinafter the Drown Trust). The beneficiaries of the Drown Trust are Jack A. Drown, Helene C. Drown, and their issue.

DNA is a wholesale distributor of magazines and paperback books of various publishers in and around Los Angeles, California. DNA was started in 1938 by Jack A. Drown and his father Earl E. Drown, who were equal partners. Jack A. Drown's partnership interest is the community property of his wife, Helene C. Drown, and Earl E. Drown's partnership interest was the community property of his wife, Blanche A. Drown.[3] Since 1961, Jack A. Drown has been the managing partner of DNA. DNA's offices and warehouses are located at 15172 Golden West Circle, Westminster, California, and DNA files its income tax returns on a calendar year basis. Prior to 1982, DNA kept its books and filed its income tax returns under the cash method of accounting. In 1982, DNA requested and was granted permission by the Commissioner to change its method of accounting to the accrual method.

Prior to the change from the cash to the accrual method of accounting, DNA attempted each year to have its cash basis income approximate the amount of income that it estimated would have been reported under the accrual method of accounting.[4] This was accomplished by DNA determining its pro forma accrual basis income based upon its historic rate of accrual basis gross profit and then

---

[3] Subsequent to the deaths of Earl E. Drown on May 6, 1961 and Blanche A. Drown on Dec. 19, 1967, their partnership interests in DNA passed under their respective wills to the Drown Trust and said interests were transferred to EDC and BDC in exchange for all of the issued and outstanding stock of the respective corporations.

[4] DNA's practice of attempting to have its cash basis income approximate accrual basis income dates back to at least the 1940's, and possibly to the inception of DNA's business in 1938.

controlling its cash disbursements during December. Typically, DNA received invoices during each month from the publishers for shipments of magazines. Then at the end of the month, it received a statement from each respective publisher for the gross amount of these invoices. With the exception of December's statement, DNA subtracted from the gross amount credits for returned magazines and submitted payment to the various publishers for the net amount. In order to achieve the desired amount of cash basis income, DNA paid to approximately 12 to 15 of the larger publishers the gross amount of the December billings without subtracting the credits for returned magazines. As a consequence, the December payments were substantially more than the amounts paid during the other months and, to the extent its cash was insufficient, DNA borrowed funds to make these payments.[5]

Most of these funds were borrowed from Bank of America where DNA had established overdraft lines of credit. Borrowings were made on a daily basis as checks to publishers were presented to the bank for payment, and repayments were made daily as DNA made deposits to its account. DNA owned tax-exempt municipal bonds that were held by Bank of America as security for the repayment of these loans.

DNA began to purchase tax-exempt municipal bonds in or around 1964. These bonds were purchased with surplus cash upon the advice of DNA's investment counselors, and such holdings at December 31, 1971, and at each yearend through 1978, at cost, were as follows:

| Year | Amount |
|------|--------|
| 1971 | $1,088,950 |
| 1972 | 1,204,397 |
| 1973 | 1,603,120 |
| 1974 | 1,722,619 |

[5] From 1972 to 1979, the comparison of December payments to payments made during the preceding and succeeding months are as follows:

| Year | October | November | December | January | Year |
|------|---------|----------|----------|---------|------|
| 1972 | $794,691 | $842,406 | $2,417,051 | $96,738 | 1973 |
| 1973 | 882,396 | 756,605 | 2,795,661 | 11,751 | 1974 |
| 1974 | 1,359,561 | 1,518,696 | 3,858,327 | 145,979 | 1975 |
| 1975 | 1,455,962 | 1,637,953 | 3,844,571 | 36,561 | 1976 |
| 1976 | 2,069,101 | 1,970,884 | 3,849,489 | 310,561 | 1977 |
| 1977 | 2,202,077 | 2,162,811 | 3,848,947 | 564,826 | 1978 |
| 1978 | 2,379,771 | 1,972,411 | 3,923,966 | 647,512 | 1979 |
| Total | 11,143,559 | 10,861,766 | 24,538,012 | 1,813,928 | Total |

| Year | Amount |
|---|---|
| 1975 | $2,908,235 |
| 1976 | 63,227,172 |
| 1977 | 63,920,173 |
| 1978 | 64,628,769 |

During the years in issue, DNA kept its tax-exempt municipal bonds in a custodianship bond account at the trust department of Bank of America. The bank would collect the cash from interest coupons, from redemptions at maturity, and from sales, and it would purchase new bonds upon the advice of DNA's broker, Blyth Dillman. As excess cash accumulated from business operations, DNA transferred funds to the bond account. Payments of cash by DNA into the bond account for the purchase of additional bonds, exclusive of reinvested collections of interest and proceeds of redemptions and sales during 1976 through 1978, were as follows:

| | 1976 | 1977 | 1978 |
|---|---|---|---|
| January | --- | --- | --- |
| February | --- | --- | --- |
| March | --- | $500 | --- |
| April | --- | --- | $505,000 |
| May | --- | --- | --- |
| June | --- | 23,400 | --- |
| July | --- | 270,520 | --- |
| August | $395,000 | --- | --- |
| September | --- | 11,950 | --- |
| October | --- | 138,741 | --- |
| November | --- | 59,810 | 18,618 |
| December | --- | --- | --- |
| Total | 395,000 | 504,921 | 523,618 |

In addition to the funds borrowed from Bank of America, DNA also received the proceeds from unsecured loans from its related entities Drown Properties, Inc. (hereinafter DPI)[7]

---

[6] These bonds represented 72.7 percent of DNA's $4,439,439 in total assets as of Dec. 31, 1976, and 83.1 percent of DNA's $4,716,872 in total assets as of Dec. 31, 1977. The record was incomplete with respect to DNA's total assets as of Dec. 31, 1978, so we could not determine what percent of total assets DNA's bond holdings represented at that time.

[7] DPI was organized as a California corporation in 1959 for the purpose of acquiring real property, vehicles, equipment, and other assets to be leased to DNA for use in its wholesale magazine and paperback book distribution business. DPI has since expanded its business to include the acquisition of other investment properties and related activities. During 1976 and 1977, one-half of the issued and outstanding stock of DPI was owned by DNA and the remaining stock was owned by the Drown Trust.

and the Drown Trust on four occasions during 1973, 1975, 1976, and 1977, and used those proceeds to pay publishers at yearend or reduce the amounts borrowed from Bank of America. The amounts of the loans and the balances due DPI and the Drown Trust from time to time between February 1, 1973, and December 31, 1978, were as follows:

| | DPI | | Drown Trust | | |
|---|---|---|---|---|---|
| Date | Loan | Repay[8] | Loan | Repay[8] | Outstanding balance due |
| 02/01/73 | $150,000 | --- | $100,000 | --- | $250,000 |
| 04/13/73 | --- | $50,000 | --- | --- | 200,000 |
| 12/31/73 | --- | --- | --- | --- | 200,000 |
| 12/13/74 | --- | 20,000 | --- | --- | 180,000 |
| 12/31/74 | --- | --- | --- | --- | 180,000 |
| 01/13/75 | --- | --- | 70,000 | --- | 250,000 |
| 04/14/75 | --- | --- | --- | $11,387 | 238,613 |
| 12/30/75 | --- | 43,708 | --- | --- | 194,905 |
| 12/31/75 | --- | --- | --- | --- | 194,905 |
| 12/29/76 | 295,000 | --- | 200,000 | --- | 689,905 |
| 12/31/76 | --- | --- | --- | --- | 689,905 |
| 05/03/77 | --- | 331,292 | --- | 358,613 | --- |
| 12/29/77 | 230,000 | --- | 347,000 | --- | 577,000 |
| 12/31/77 | --- | --- | --- | 35,500 | 541,500 |
| 01/23/78 | --- | 230,000 | --- | --- | 311,500 |
| 02/27/78 | --- | --- | --- | 150,000 | 161,500 |
| 04/14/78 | --- | --- | --- | 10,000 | 151,500 |
| 11/06/78 | --- | --- | --- | 300,000 | (148,500) |
| 12/31/78 | --- | --- | --- | --- | (148,500) |

Interest accrued on the outstanding balances to DPI and the Drown Trust at the rate of 6 percent per annum. DNA paid interest to DPI of $19,138 and $6,440 for the taxable years 1976 and 1977, respectively, and to the Drown Trust of $37,519 and $10,792 for the taxable years 1976 and 1977, respectively. Said payments of interest were deducted by DNA on its income tax returns for 1976 and 1977, respectively. In his statutory notices of deficiency, respondent disallowed these claimed interest deductions.[9] The disallow-

---

[8] DNA's accounts with DPI and the Drown Trust also were debited and credited periodically for various other payments made or funds received by DNA for the accounts of the other entities, or for payments made or funds received by the other entities for the account of DNA.

[9] Respondent also disallowed the claimed interest deductions taken with respect to the funds borrowed from Bank of America. Petitioners have stipulated that such disallowance was proper.

ance was based upon his determination that the interest expense was on indebtedness incurred to purchase or carry tax-exempt obligations within the meaning of section 265(2).

## OPINION

The sole issue for our resolution is whether DNA may deduct interest expense incurred with respect to loans from its related entities DPI and the Drown Trust. Section 163(a) allows a deduction for all interest paid or accrued on indebtedness within a taxable year. Section 265(2), however, disallows such interest deduction for interest paid "on indebtedness incurred or continued to purchase or carry obligations the interest on which is wholly exempt from * * * taxes."

The purpose of section 265(2) is to prevent a taxpayer from obtaining a double tax benefit by deducting interest on borrowed funds which enable the taxpayer to purchase or carry securities bearing tax-exempt interest. *Denman v. Slayton*, 282 U.S. 514, 515 (1931). Section 265(2), however, does not become operative merely by the simultaneous existence of an indebtedness and the holding of tax-exempt obligations. *Bradford v. Commissioner*, 60 T.C. 253, 257-258 (1973). Rather, this disallowance provision applies when the facts demonstrate that the purpose of incurring or continuing indebtedness is to purchase or carry tax-exempt securities. *Phipps v. United States*, 188 Ct. Cl. 531, 539-540, 414 F.2d 1366, 1372 (1969); *New Mexico Bancorporation v. Commissioner*, 74 T.C. 1342, 1352-1353 (1980). Although his intentions are relevant, the determination of the taxpayer's purpose is not dependent upon subjective factors and may be inferred from objective factors such as his conduct and the circumstances that confronted him. *Indian Trail Trading Post, Inc. v. Commissioner*, 60 T.C. 497, 500 (1973), affd. 503 F.2d 102 (6th Cir. 1974); *Israelson v. United States*, 367 F. Supp. 1104, 1107 (D. Md. 1973), affd. without published opinion 508 F.2d 838 (4th Cir. 1974). Resolution of this issue requires an inquiry into the connection and relationship between the tax-exempt securities and the indebtedness. The prohibited purpose must be established by the showing of a sufficiently direct relationship between the indebtedness and the exempt securities. *Wisconsin Cheese-*

*man, Inc. v. United States*, 388 F.2d 420, 422 (7th Cir. 1968); *Investors Diversified Services, Inc. v. United States*, 216 Ct. Cl. 192, 200, 575 F.2d 843, 848 (1978); *Illinois Terminal Railroad Co. v. United States*, 179 Ct. Cl. 674, 682-683, 375 F.2d 1016, 1020-1021 (1967); *New Mexico Bancorporation v. Commissioner, supra* at 1353.

Respondent maintains that the interest paid by DNA to the Drown Trust and to DPI was nondeductible interest paid on an "indebtedness incurred or continued to purchase or carry" tax-exempt securities, and he relies primarily on *Wisconsin Cheeseman, Inc., supra*, as support for his position. We agree with respondent.

In *Wisconsin Cheeseman, Inc.*, the taxpayer had a seasonal business and the bulk of its sales were made during the last 3 months of each calendar year. During these last 3 months the taxpayer's cost of production was highest, which created a shortage of working capital. To meet its need for working capital, the taxpayer annually obtained short-term loans, which were repaid as receipts from its sales were collected. The balance of the receipts was used to purchase both tax-exempt bonds and taxable treasury bills. The treasury bills were used, as they matured, to meet the off-season needs of the business. The tax-exempt bonds were used as collateral for the bank loans during the next business cycle.

The Commissioner disallowed the taxpayer's deductions of interest with respect to some of the short-term loans on the basis that the loans were incurred to "carry obligations the interest on which is wholly exempt" from income tax within the meaning of section 265(2). The Seventh Circuit upheld the Commissioner's determination finding that a "sufficiently direct relationship" between the continuance of the debt and the carrying of tax-exempt bonds was established by the fact that the tax-exempt securities were used as collateral for the seasonal loans.[10] More importantly for purposes of the instant case, in *Wisconsin Cheeseman, Inc. v. Commissioner, supra* at 422-423, the Seventh Circuit went on to state:

---

[10] It should be mentioned that the mere fact tax-exempt securities are used to collateralize loans does not, by itself, establish the required direct relationship between the incurrence or continuance of indebtedness and the carrying of such securities. *New Mexico Bancorporation v. Commissioner*, 74 T.C. 1342, 1353 (1980).

In addition, * * * the deduction should not be allowed if a taxpayer could *reasonably have foreseen* at the time of purchasing the tax-exempts that a loan would probably be required to meet future economic needs of an ordinary, recurrent variety. This test would not permit this taxpayer to deduct the short-term loan interest, for its regular business pattern shows that it would have to go into debt each fall if it bought or kept municipals as a long-term investment.[3] This established course of conduct is convincing proof that the underlying reason for these recurring loans was to carry the municipals. [Emphasis added.]

[3]Under this test, the deduction would be disallowed here even if the municipals were not used as collateral for the short-term loans.

We agree with the Seventh Circuit's statement and find that such a circumstance warrants an inference that the indebtedness was incurred or continued for the purpose of purchasing or carrying tax-exempt securities.[11]

In the instant case, it has been DNA's practice since at least the 1940's, and possibly since its business inception in 1938, to attempt to have its cash basis income approximate accrual basis income. In an effort to achieve this objective, DNA annually accelerated its payments to publishers in December. This resulted in December payments being substantially more, and the succeeding January payments being substantially less, than the amounts paid to publishers during the other months. To the extent its cash was insufficient, DNA annually would borrow funds from Bank of America, DPI, and the Drown Trust to fund these large December payments. This pattern of annually borrowing funds dates back to at least 1973.

Despite this pattern of annually borrowing funds at yearend, DNA continued to purchase tax-exempt bonds from excess funds generated from its business. These purchases totaled $395,000, $504,921, and $523,618 for 1976, 1977, and 1978, respectively. It is obvious that, at the time of these purchases, DNA reasonably could have foreseen that a loan probably would be necessary to satisfy its future economic needs, which were of an ordinary, recurrent nature.[12] In fact, petitioners even admitted this on brief.

[11]The foreseeability test has been implicitly accepted by this Court. See *Ball v. Commissioner*, 54 T.C. 1200, 1209 (1970); *Leslie v. Commissioner*, 50 T.C. 11, 20-21 (1968), revd. on other grounds 413 F.2d 636 (2d Cir. 1969).

[12]Petitioners' reliance on *Handy Button Machine Co. v. Commissioner*, 61 T.C. 846 (1974), is misplaced in that, at the time the taxpayer purchased tax-exempt securities, there was no

Petitioners maintain that *Wisconsin Cheeseman, Inc.* is distinguishable from the instant case. They contend that, unlike the taxpayer in *Wisconsin Cheeseman, Inc.*, DNA was not engaged in a seasonal business. We find this distinction irrelevant. It was the fact that the taxpayer had an ordinary, recurrent need for cash, and not the fact that it was engaged in a seasonal business, that was pivotal in *Wisconsin Cheeseman, Inc.* In the instant case, DNA also had a recurrent need for cash that was foreseeable at the time it purchased tax-exempt bonds. In addition, it should be noted that, unlike the situation in *Wisconsin Cheeseman, Inc.*, DNA's cash requirements at yearend for making payments to publishers were not necessitated by business reasons. Rather, substantial amounts of these payments were discretionary and were made only in order to gain the advantages provided by the cash method of accounting (i.e., such payments were made by DNA in an attempt to have its cash basis income approximate accrual basis income).

Petitioners also contend that the length of time for which financing was required in *Wisconsin Cheeseman, Inc.* was much greater than in the instant case. They argue that, because of its strong cash flow, DNA could have repaid its loans to DPI and the Drown Trust within 4 and 17 days of the execution of such loans in 1976 and 1977, respectively. We do not find this argument persuasive. Rather, we find that the fact that DNA could have repaid its loans to DPI and the Drown Trust, but chose not to, supports our finding that the loans were incurred and continued to purchase and carry tax-exempt securities. This is exemplified by the fact that, in April of 1978, DNA purchased $505,000 in tax-exempt bonds when it still owed the Drown Trust $151,500. In fact, an analysis of all of DNA's purchases of tax-exempt bonds from excess cash accumulated from business operations during 1976 and 1978 indicates that all such purchases were made at a time when there were outstanding loans to either DPI or the Drown Trust.[13]

---

foreseeable need to borrow funds. Furthermore, the obligation was incurred by the taxpayer to redeem the stock of one of its principal shareholders and thus, was not of an ordinary, recurrent nature.

[13] All purchases of tax-exempt bonds by DNA during 1977, with the exception of a $500 purchase in March of 1977, were made when there were no outstanding loans to DPI or to the

Finally, petitioners contend that, since they have conceded that the interest DNA incurred with respect to loans obtained from Bank of America is not deductible because such loans were secured by tax-exempt securities, the question of foreseeability with respect to DNA's bank financing is therefore rendered moot. If petitioners' use of the words "bank financing" is intended solely to refer to funds borrowed by DNA from Bank of America, we agree with petitioners' contention. However, we disagree that the question of foreseeability with respect to DNA's obtaining funds from DPI and the Drown Trust is moot. The Seventh Circuit articulated the foreseeability test as an alternative ground upon which to find that a "sufficiently direct relationship" between the continuance of debt and the carrying of tax-exempt bonds could be established. The fact that DNA's loans from DPI and the Drown Trust were unsecured is irrelevant as the Seventh Circuit specifically stated that "Under this [foreseeability] test, the deduction would be disallowed here even if the municipals were not used as collateral for the short-term loans." *Wisconsin Cheeseman, Inc. v. Commissioner*, 388 F.2d 420, 423 n. 3 (7th Cir. 1968).

There is another factor that supports our finding that DNA's indebtedness to DPI and the Drown Trust was incurred and continued to purchase and carry tax-exempt securities. The record demonstrates that DNA kept its portfolio of tax-exempt bonds as a long-term investment. DNA never attempted to liquidate any of its bonds to either alleviate its shortage of funds at yearend or to reduce or eliminate its outstanding indebtedness to DPI and the Drown Trust. We find this to be of particular relevance given the fact DNA's portfolio of tax-exempt bonds was substantial and represented 72.7 percent and 83.1 percent of DNA's total assets as of December 31, 1976, and December 31, 1977, respectively.[14] Such a substantial investment in tax-exempt securities, while not necessarily dispositive, makes it more difficult to find that the relationship between

Drown Trust. However, such purchases were made when it was reasonably foreseeable that DNA would have a substantial cash requirement at yearend.

[14] The instant case clearly is distinguishable from those cases (*Ball v. Commissioner*, 54 T.C. 1200 (1970); *Batten v. United States*, 322 F. Supp. 629 (E.D. Va. 1971)), in which the percentages of the taxpayer's assets invested in tax-exempt securities was quite small.

the loans and the tax-exempt securities was merely a coincidence.[15] To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

[15]*McDonough v. Commissioner*, T.C. Memo. 1977-50. See also *Israelson v. United States*, 367 F. Supp. 1104 (D. Md. 1973), affd. without published opinion 508 F.2d 838 (4th Cir. 1974)(the taxpayer's investment in tax-exempt bonds represented approximately one-third of his assets, a fact that the court stated helped shed light on whether the taxpayer's large bank loan was incurred and continued to purchase and carry tax-exempt securities).