SWENSON LAND AND CATTLE CO., INC., PETITIONER *v.* COM-
MISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2309-71.    Filed July 30, 1975.

*S. L. Warhaftig,* for the petitioner.
*Walter C. Welsh* and *Peter W. Mettler,* for the respondent.

RAUM, *Judge:* The Commissioner determined deficiencies of $15,625.70 and $14,812.23 in petitioner's Federal income taxes for the calendar years 1967 and 1968, respectively. At issue are: (1) Whether portions of the interest expense deductions claimed by petitioner for the taxable years should be disallowed because they represent interest on indebtedness "continued to purchase or carry" tax-exempt obligations within the meaning of section 265(2), I.R.C. 1954; and if so, (2) how those portions should be determined. The question of the average fair market values of petitioner's assets, should that become relevant to the computation of disallowed interest deductions, has been severed for separate trial.

FINDINGS OF FACT

The parties have filed stipulations of fact which, together with the accompanying exhibits, are incorporated herein by this reference.

Petitioner Swenson Land & Cattle Co., Inc., is a New York corporation which had its principal office in New York, N.Y., at the time it filed its petition herein.

Petitioner, originally known as Swenson Texas Corp., was organized in 1926 by two brothers, Eric P. and Swen A. Swenson, and their sister, Mrs. Eleanora S. Towne. At that time they transferred their jointly owned cattle business to the corporation. Each of the organizers received a third of petitioner's stock which has since been passed to his or her descendants and to the descendants' families although, due to certain sales within the family, the relative holdings of the family groups in respect of one another has been altered. During the years at issue petitioner had outstanding 900 shares of class A common stock and 900 shares of class B common stock. The two classes were alike in all respects except that only the class A stock had voting rights.

At the time they organized petitioner, the original three stockholders also transferred land to petitioner in exchange for which petitioner issued bonds to them in the principal amount of $3,800,000, divided about equally among them. By the terms of the governing Debenture Bond Agreement, executed on December 31, 1926, by petitioner and the National City Bank of New York as trustee for the bondholders, the bonds had a maturity date of December 31, 1966, and bore interest at the rate of 5 percent per annum payable on December 31 each year, provided there were sufficient earnings available. During the years 1967 and 1968, petitioner's outstanding bonds (the maturity dates of which had meanwhile been extended, as hereinafter explained) were held by six trusts, under the terms of each of which the trustee was required to distribute to the beneficial owners of the bonds, on a current basis, all interest and principal payments with respect to the bonds. Since the time that petitioner issued the bonds, the only beneficial owners have been petitioner's organizers, their descendants, and their descendants' family members, although in different proportions and, in some cases, by different individuals than in the case of the petitioner's stock.

The original terms of the Debenture Bond Agreement of 1926 remained in effect until 1959 at which time petitioner, concerned that it might not be able to accumulate sufficient funds to redeem the bonds at their maturity in 1966, negotiated an amendment to the agreement with the trustee (then known as the First National City Bank of New York). The Supplemental Trust Agreement, dated December 31, 1959, made the obligation to pay interest of 5 percent per annum unconditional and

provided for the repayment of principal, pro rata among the bonds, according to the following schedule:

$100,000 on Dec. 31, 1959
100,000 on Dec. 31, 1960
100,000 on Dec. 31, 1961
100,000 on Dec. 31, 1962
100,000 on Dec. 31, 1963
100,000 on Dec. 31, 1964
100,000 on Dec. 31, 1965
300,000 on Dec. 31, 1966
1,000,000 on Dec. 31, 1976
1,800,000 on Dec. 31, 1986 (maturity)

Under the amended agreement petitioner was empowered without penalty to pay additional amounts of principal on December 31 of any year, such payment to be apportioned pro rata among the bonds. Moreover, any such payment was to be applied to reduce the amount due upon maturity, and upon fully repaying that amount, to reduce the next latest installment payment remaining unpaid.

Petitioner made each of the installment payments scheduled from 1959 through 1966, thereby reducing the unpaid principal to $2,800,000 as of 1967.

During all of the relevant years petitioner was engaged primarily in a phase of the cattle industry referred to as a cow-calf operation, which it conducted on four ranches consisting of about 250,000 acres of land in west Texas. Maintaining a herd of about 10,000 cows, petitioner sold each year's calf crop, after weaning, to feeders. The feeders, most of whom were located in the Midwest, fed and fattened the calves for eventual slaughter.

Petitioner conducted its cow-calf operation in such manner that all of the calf crop was ready for shipment at approximately the same time each year. Petitioner priced its calves in late August and delivered the purchased calves from late September through early November. Customarily, petitioner required a small deposit, $500 or $1,000, with each order as earnest money, with the balance of the purchase price payable shortly after delivery. Normally, the total amount of earnest money received in a single year ranged from $15,000 to $20,000.

Expenses for the cow-calf operation during the first 9 or 10 months of the year, during which time it generated little or no income, normally amounted to about $50,000 per month. As a result, petitioner had to have approximately $450,000 or

$500,000 of working capital on hand at the start of each year. Additional cash or liquid reserves, perhaps as much as about another $400,000, were also considered essential since cattle prices might be unexpectedly low in a particular year or a drought or other unfavorable weather condition might adversely affect grazing on the ranches making it necessary to purchase additional feed for the cattle. During 1956 and 1957, for example, petitioner's cow-calf operation was severely impaired by droughts, which not only forced petitioner to purchase supplemental feed for the cattle but also to reduce the size of its herd. At no time, however, did petitioner establish special reserves on its financial statements either for working capital or for contingencies.

The working capital needs created by the seasonal nature of the cow-calf operation were alleviated in part by substantial rents and royalties which petitioner received each year from various oil companies to which it had leased the mineral rights under its ranches. Petitioner did not itself engage in any exploration or drilling operations. In the years 1951 through 1973 petitioner, on the cash basis method of accounting, earned income from cattle sales and received rents and royalties [1] as follows: [2]

| Year | Receipts from cattle sales | Income from cattle operations | Rents and royalties |
|---|---|---|---|
| 1951 | $322,678 | $123,471 | $123,782 |
| 1952 | 1,109,719 | 38,372 | 205,875 |
| 1953 | 435,389 | 369,387 | 192,673 |
| 1954 | 596,790 | (40,746) | 238,873 |
| 1955 | 683,211 | 19,235 | 257,929 |
| 1956 | 688,265 | (257,712) | 277,829 |
| 1957 | 498,052 | (239,658) | 297,547 |
| 1958 | 643,820 | 96,447 | 290,386 |
| 1959 | 496,239 | (219,041) | 195,446 |
| 1960 | 628,252 | (45,571) | 605,178 |
| 1961 | 690,676 | (114,293) | 146,429 |
| 1962 | 977,638 | 140,499 | 207,285 |
| 1963 | 946,815 | 20,828 | 216,754 |
| 1964 | 931,227 | 156,000 | 222,871 |
| 1965 | 1,125,758 | 245,842 | 233,794 |
| 1966 | 1,016,917 | 221,129 | 168,068 |
| 1967 | 1,528,907 | 667,933 | 173,418 |

---

[1] Included in the figures for rents and royalties are cash bonuses received at the time the leases were executed.

[2] All figures are rounded to the nearest dollar.

| Year | Receipts from cattle sales | Income from cattle operations | Rents and royalties |
|------|---------------------------|-------------------------------|---------------------|
| 1968 | $1,195,242 | $303,208 | $125,440 |
| 1969 | 1,042,478 | 123,692 | 121,616 |
| 1970 | 957,229 | (14,748) | 153,258 |
| 1971 | 1,429,530 | 324,349 | 191,428 |
| 1972 | 1,283,911 | 224,027 | 119,437 |
| 1973 | 2,013,212 | 605,303 | 118,633 |

In view of petitioner's uneven and often comparatively modest earnings history in the 1950's and early 1960's there were some among petitioner's stockholders who thought that petitioner ought to expand the scope of its cattle business in an effort to improve its return on investment or, alternatively, to prepay its indebtedness and thereby allow the various bondholders to invest the distributed capital individually. On or about May 10, 1966, a minority of three of petitioner's directors, who in the aggregate represented 49½ percent of its voting stock, submitted to the full board of directors a report of their opinions and recommendations. This report, which has been referred to as the "Minority Report," deemed the return on capital from petitioner's existing operations to be inadequate, alleging that management had failed to keep costs down and to employ modern techniques. To improve the situation it proposed a number of changes, many of which were designed to upgrade the performance of the cow-calf operation by introducing new breeding practices as well as improving existing procedures. But the major and most costly changes proposed in the report were the conversion of between 25,000 and 30,000 acres of land from pasturage to the cultivation of wheat and the introduction of "yearling" or "finish-feeding" programs. These latter terms refer to the stage in the calves' lives at which petitioner sells them. Both programs would entail keeping calves through the winter, an additional 5 months or so, during which time petitioner's investment in them would not be recovered and its feeding expenses would continue. It could then sell them as heavier yearlings in the following spring, or alternatively, continue to feed and to fatten them until they were large enough to be sold directly for slaughter.

Several months later W. S. Elmore, petitioner's president, submitted to the board of directors a reply to the minority report. This reply, which expressed the views of management and,

indirectly, those of the 50½ percent voting majority of stockholders, questioned the efficacy of many of the methods suggested in the minority report, and defended the practices then in use and the results which they had produced. In respect of the recommendations pertaining to wheat farming and yearling and finish-feeding programs, the reply reiterated its opposition to such proposals in the past. Characterizing these proposed new ventures as requiring a large investment of additional capital and inherently more risky than the present cow-calf operation, it concluded that these were not attractive directions in which to expand, and that on the whole "the company can best achieve its goals, with lower costs involved, by continuing its operation along the lines currently being pursued."

At some time after the submission of these two reports, petitioner's board of directors employed Doane Agricultural Service, Inc. (Doane), to study the company, its management and procedures, and to make recommendations which, in its opinion, might enhance the return from the petitioner's properties. The overall cost of this study was about $7,300.

On December 31, 1966, while awaiting Doane's report, petitioner paid $300,000 of bond principal pursuant to the Supplemental Trust Agreement. The next scheduled payment was not due until December 31, 1976.

On or about June 16, 1967, Doane submitted to the board of directors a report on phase I of its study in which it proposed many of the same changes advocated in the minority report. In particular, it concluded:

The ranking of the enterprises studied, has in general indicated, that forage sorghum silage, wheat, and stocker-feeder calf enterprises should be considered to compliment [sic] the cow-calf enterprise.

On or about October 2, 1967, Doane submitted to the board of directors its report on phase II of the study, which presented specific operating programs for the implementation of its earlier recommendations. It estimated that it would take 5 to 6 years to institute the programs during which time the following capital expenditures, annual income, expenses, and cash flow budget could be anticipated:

| | Estimated capital expenditures [3] | Estimated income | Estimated expenses | Estimated returns to land and management |
|---|---|---|---|---|
| 1967 | $22,200 | $337,000 | --- | $337,000 |
| 1968 | 326,480 | 1,217,370 | $482,025 | 735,345 |
| 1969 | 253,000 | 1,443,613 | 693,223 | 750,390 |
| 1970 | 294,880 | 1,651,530 | 897,644 | 753,886 |
| 1971 | 198,730 | 1,911,623 | 1,089,404 | 822,219 |
| 1972 | 41,940 | 1,938,438 | 1,082,679 | 855,759 |
| Total | 1,137,230 | 8,499,574 | 4,244,975 | 4,254,599 |

Although the Doane recommendations involved large amounts of money, petitioner was nonetheless in a financial position to consider adopting them. Over the years petitioner had accumulated funds for the retirement of its bonds, with which funds it had maintained an extremely liquid portfolio of securities. Prior to 1965 petitioner had limited its investments largely to United States Government short-term obligations and other short-term securities. In 1965, in order to obtain a higher yield after taxes, it converted the bulk of its portfolio to obligations issued by various State and local governmental bodies, the interest on which was wholly exempt from Federal income taxation. In order to maintain liquidity, it purchased obligations which would mature almost exclusively in the following year. On December 31 of each year, 1966, 1967, and 1968, all of the tax-exempt obligations held by petitioner were due to mature in less than 1 year.

It appears that the Doane proposals were under active consideration at least as late as March 1968. Petitioner's board of directors met on March 12, 1968, at which time, according to the minutes of their meeting, it considered the possibility of prepaying a "substantial portion" of the outstanding $2,800,000 of bond principal, in light of the large amount of liquid assets held by the corporation, nearly $2 million, as of December 31, 1967. However, it was suggested that "prepayment might be inconsistent with the possible expenditures which would be necessitated by adoption of the Doane recommendations," although it was recognized that "if the company's favorable earnings capacity continued, the company might very well

---

[3] At the end of its report, Doane stated that "the limiting factor" for the sorghum silage, wheat, and stocker-feeder programs which "are dependent on each other for maximum efficiency and returns * * * is the availability of water for the stocker-feeder cattle, and * * * the estimated capital cost for establishing this source * * * is not included in this report."

finance such capital requirements out of current income." In part, because no prepayment was possible except on December 31 of each year, the matter was tabled until the next meeting later that year.

Yet, despite having the financial wherewithal, petitioner ultimately rejected the Doane recommendations. Although the Doane report included much of what had been said in the minority report, including its recommendation for expansion of the business, the detailed financial exposition contained therein ultimately persuaded the minority shareholders that the necessary investment was much larger than they were willing to commit to the business. Moreover, it was management's opinion (1) that the required investment would be even higher on account of associated matters, such as new bunkhouses for the additional farmers, and (2) that the current management people in Texas were not qualified to conduct the expanded operation and would have to be replaced. The Doane recommendations were finally rejected in about May 1968.

At the board of directors meeting on October 29, 1968, the directors voted to prepay $1 million of the principal on petitioner's bonds on December 31 of that year. At their meeting on November 14, 1969, the board of directors authorized an additional prepayment of $200,000 on December 31, of that year. In both 1972 and 1973 petitioner made additional prepayments of $500,000 and $100,000, respectively.

At some time during 1970 petitioner discontinued its practice of investing a portion of its portfolio in tax-exempt securities. And as of December 31, 1973, it had not again acquired any securities of this type.

From the year 1951 through 1973, petitioner's liquid assets as of December 31 of each year consisted of the following:

PETITIONER'S CASH ON HAND AND PORTFOLIO AS OF DECEMBER 31 [4]

| Year | Cash on hand | U.S. Government securities | Other securities[5] | Tax-exempt securities | Total |
|---|---|---|---|---|---|
| 1951 | $694,336 | $109,000 | | | $803,336 |
| 1952 | 835,924 | 109,000 | | | 944,924 |
| 1953 | 130,968 | 608,219 | | | 739,187 |
| 1954 | 291,858 | 594,578 | | | 886,436 |
| 1955 | 380,347 | 726,484 | | | 1,106,831 |
| 1956 | 251,462 | 693,531 | | | 944,993 |
| 1957 | 253,185 | 652,531 | | | 905,716 |
| 1958 | 267,976 | 1,053,367 | | | 1,321,343 |
| 1959 | 233,944 | 753,234 | | | 987,178 |
| 1960 | 559,691 | 797,879 | | | 1,357,570 |
| 1961 | 178,205 | 945,878 | | | 1,124,083 |
| 1962 | 312,597 | 801,304 | $100,000 | | 1,213,901 |
| 1963 | 304,905 | 502,578 | 600,000 | | 1,407,483 |
| 1964 | 177,712 | 502,578 | 900,000 | | 1,580,290 |
| 1965 | 213,643 | 502,578 | | $1,001,174 | 1,717,395 |
| 1966 | 144,965 | | | 1,304,078 | 1,449,043 |
| 1967 | 133,936 | | 99,022 | 1,817,704 | 2,050,662 |
| 1968 | 147,386 | | 199,256 | 700,200 | 1,046,842 |
| 1969 | 262,233 | | 397,973 | 249,495 | 909,701 |
| 1970 | 150,808 | | 750,000 | | 900,808 |
| 1971 | 182,860 | | 1,438,779 | | 1,621,639 |
| 1972 | 188,879 | | 687,679 | | 876,558 |
| 1973 | 196,145 | | 1,086,354 | | 1,282,499 |

In the year 1967 petitioner carried tax-exempt securities in the average amount of $1,218,393, computed on the basis of a monthly average. The aggregate adjusted basis of petitioner's assets during the year 1967 [6] was $5,936,183, computed as an average of petitioner's aggregate adjusted bases at the opening and closing of the year. Petitioner paid interest on its bonds for 1967 in the amount of $140,000, which amount it deducted from gross income on its income tax return for that year.

For the year 1968 petitioner carried tax-exempt securities in the average amount of $1,344,302, computed on the basis of a

---

[4] All figures are rounded to the nearest dollar and represent petitioner's cost. Excluded from the table are certain "miscellaneous securities" listed on petitioner's financial statements for 1954-61 at a cost of $5,000 and at a cost of $2,500 on the statement for 1962. Also excluded are petitioner's holdings of the stock in American Home Properties Corp. These shares were acquired in 1963 in exchange for other stock held by petitioner, and were listed at a nominal value, $1, on its statements for 1963-73. The notes appended to the statements estimated market values of this stock which ranged from $28,675.63 in 1963 to $129,808 in 1972.

[5] Includes time deposits in 1970-73.

[6] The stipulation of facts submitted by the parties refers here to "1969" which we assume, from the context in which it appears, is an inadvertent typographical error.

monthly average. The aggregate adjusted basis of petitioner's assets during the year 1968 was $6,252,119, computed as an average of petitioner's aggregate adjusted bases at the opening and closing of the year. Petitioner paid interest on its bonds for 1968 in the amount of $140,000, which amount it deducted from gross income on its income tax return for that year in addition to other interest it paid in the amount of $95.

In his deficiency notice to petitioner the Commissioner determined that:

the deductions claimed as interest on your returns for the taxable years ended December 31, 1967 and December 31, 1968 should be disallowed to the extent of $28,735.00 and $30,123.00 respectively, for the reason that they are not allowable under the provisions of section 265(2) of the Internal Revenue Code.

## OPINION

The controversy in this case concerns the deductibility of certain interest expenses incurred by petitioner during 1967 and 1968. The uncontested facts show that petitioner continued its indebtedness during 1967 and 1968 in the amount of $2,800,000, on account of which it incurred interest expenses of $140,000 in each of the taxable years and for which it claimed deductions on its Federal income tax returns. Nor is there any question that at the time it continued this indebtedness, petitioner owned tax-exempt securities in the face amount of approximately $1.3 million and $1.8 million as of the beginning of 1967 and 1968, respectively. What is not agreed is whether section 265(2), I.R.C. 1954,[7] is applicable in these circumstances.

Section 265(2) provides that there shall not be allowed a deduction for interest on indebtedness which was "continued to purchase or carry" tax-exempt obligations. Although the statutory language is seemingly plain enough, the courts have restricted the operation of section 265(2) to those situations in which it can be shown that the relationship between the indebtedness and the tax-exempt securities involves more than their mere simultaneous existence in respect of a single taxpayer.

[7] SEC. 265. EXPENSES AND INTEREST RELATING TO TAX-EXEMPT INCOME.
No deduction shall be allowed for—
* * *
(2) INTEREST.—Interest on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest on which is wholly exempt from the taxes imposed by this subtitle. * * *

*Levitt v. United States,* 517 F. 2d 1339, 1343-1344 (8th Cir.); *Mariorenzi v. Commissioner,* 490 F. 2d 92, 93 (1st Cir.), affirming a Memorandum Opinion of this Court; *Handy Button Machine Co.,* 61 T.C. 846, 852; *Indian Trail Trading Post, Inc.,* 60 T.C. 497, 500, affirmed 503 F. 2d 102 (6th Cir.); *James C. Bradford,* 60 T.C. 253, 257-258; *Edmund F. Ball,* 54 T.C. 1200, 1207; *Israelson v. United States,* 367 F. Supp. 1104, 1106 (D. Md.), affirmed without published opinion 508 F. 2d 838 (4th Cir.); *Batten v. United States,* 322 F. Supp. 629, 631 (E.D. Va.). Thus, despite the fact that petitioner here would not have had sufficient liquid assets with which to purchase and carry its tax-exempt securities *but for* its bond indebtedness, a tighter nexus between the two is required for the operation of section 265(2). Specifically, section 265(2) applies only when "the *purpose* for which the indebtedness is incurred or continued is to purchase or carry tax-exempt obligations." (Emphasis supplied.) *Leslie v. Commissioner,* 413 F. 2d 636, 638 (2d Cir.), reversing 50 T.C. 11, certiorari denied 396 U.S. 1007; see also *Indian Trail Trading Post, Inc.,* 60 T.C. at 500; *James C. Bradford,* 60 T.C. at 258; *Phipps v. United States,* 414 F. 2d 1366, 1372 (Ct. Cl.). Therefore, the pivotal inquiry here is whether there was a "purposive connection" or a "sufficiently direct relationship" between the continuation of petitioner's bond indebtedness and its ownership of the tax-exempt obligations which would fall within the proscription of section 265(2). *Handy Button Machine Co.,* 61 T.C. at 852; see also *Wisconsin Cheeseman, Inc. v. United States,* 388 F. 2d 420, 422 (7th Cir.); *Illinois Terminal Railroad Co. v. United States,* 375 F. 2d 1016, 1021 (Ct. Cl.); *Israelson v. United States,* 367 F. Supp. at 1107; *Edmund F. Ball,* 54 T.C. at 1207; *Kirchner, Moore & Co.,* 54 T.C. 940, 951, affirmed 448 F. 2d 1281 (10th Cir.).

Petitioner contends that its decision not to prepay any of its bond indebtedness on December 31, 1966 and 1967, reflected its directors' judgment that such funds ought to be kept in the business both to meet its ordinary working capital needs in 1967 and 1968 and to provide the possible additional cash requirements associated with the proposed expansion of its cow-calf operation. In support of this, petitioner asserts that even if it had liquidated its holdings in tax-exempt securities at that time, it would not have prepaid any of its debt in view of the business' needs. And, it further points out, when those contingent cash

requirements disappeared with the final rejection of the Doane proposals, in 1968, petitioner did prepay $1 million of its debt on the next payment date, from which fact petitioner would have us conclude that the contemplated operational changes were substantial and bona fide reasons for continuing its debt through 1967 and 1968.

The Commissioner, on the other hand, questions the seriousness with which petitioner even considered adopting the proposed changes, arguing that the mere alleged possibility of increased capital requirements is not sufficient to insulate petitioner from the operation of section 265(2). In addition, even assuming that petitioner was prepared to adopt such changes, the Commissioner takes the position that petitioner has grossly overstated its cash requirements which in fact did not exceed its liquid assets other than tax-exempt securities, on account of which he concludes that there was no reason to continue at least a portion of its indebtedness except to enable it to continue to carry tax-exempt obligations. Although the matter is not entirely free from doubt, in light of all the circumstances we agree with petitioner.

In proving the absence of the proscribed purpose of section 265(2), a showing by the taxpayer that its business plans included nonrecurring capital outlays for which borrowing was necessary has been deemed sufficient, even though due to special circumstances those borrowed funds are temporarily invested in tax-exempt securities until the taxpayer is able to put them to their intended use. Cf. *Wisconsin Cheeseman, Inc. v. United States,* 388 F. 2d at 423; Rev. Rul. 55-389, 1955-1 C.B. 276. Guided by this standard, we are of the opinion that petitioner has adequately demonstrated the existence of business-oriented reasons which induced it to continue its indebtedness during 1967 and 1968, a conclusion which must be deemed to negate the existence of the proscribed purpose of section 265(2).

To begin with, we note that petitioner arranged to extend the final payment date on its bonds in 1959, at least 5 years before it first purchased any tax-exempt securities. Indeed, on this record we are satisfied that petitioner extended its indebtedness wholly on account of its realization that business reversals had made it unlikely that petitioner would be able to meet the original payment date, December 31, 1966. This circumstance distinguishes this case from the situation in *Illinois Terminal*

*Railroad Co. v. United States,* 375 F. 2d 1016 (Ct. Cl.), in which the taxpayer extended its indebtedness in order to avoid the necessity of otherwise having to liquidate its *currently held* tax-exempt securities to pay off the indebtedness. Although the difference is one of timing, this has been considered a "significant element," *Handy Button Machine Co.,* 61 T.C. at 852-853, and it convinces us that petitioner did not extend its indebtedness in 1959 in order later to have excess funds with which to purchase tax-exempt securities.

Likewise, we are satisfied that there were business considerations which later prompted petitioner not to prepay its indebtedness with its excess accumulated funds. In the first place, due to the seasonal nature of its cow-calf operation, petitioner did not receive payments for cattle (other than comparatively nominal earnest money) until at least September or October of each year up until which time operating expenses averaged about $50,000 a month, or approximately $500,000. In addition, contingencies such as bad weather or a sudden drop in cattle prices required petitioner to maintain an additional cash reserve of about $400,000. Although the amount of the contingency reserve strikes us as perhaps large as compared to the level of ordinary operating expenses, this is wholly consistent with what we perceive to have been petitioner's conservative pattern of business in the past, and we are therefore persuaded that petitioner in fact regarded the maintenance of this reserve fund in that amount as essential to the proper conduct of its business. Our conclusion in this respect is buttressed, we think, by petitioner's consistent practice in past years of maintaining substantial liquid reserves, a practice which began well before petitioner first purchased tax-exempt securities.

The other circumstance which induced petitioner to continue its bond indebtedness during the taxable years was the possibility that it would be necessary to invest a considerable amount of capital in its business in the event the Doane proposals were adopted. Although petitioner's management initially rejected the expanded cattle-feeding and -farming proposals of the minority report in 1966, there was enough interest in resolving these differences in viewpoint that petitioner nevertheless commissioned Doane Agricultural Service, Inc., at that time to study the entire matter. In light of the fact that petitioner was a family-owned corporation and that the minority represented 49½

percent of the stock interest, it is not at all unreasonable to accept petitioner's assertion that the adoption of some or all of these proposals remained a very real possibility on December 31, 1966, the time at which petitioner chose to continue its $2,800,000 bond indebtedness through 1967. The Doane recommendations were submitted to the board of directors around October 1967, and it is not surprising that by December 31, 1967, the directors had not yet arrived at a consensus in respect of such an expensive and obviously important departure from petitioner's past business practices.

Although the Doane report envisioned income in excess of total expenditures for each of the next 6 years, the amount of capital expenditures for which it called was nonetheless very substantial, running to well over $1 million in the course of those years, and the estimated expenses exceeded $4 million. Moreover, it did not estimate the cost of associated but necessary changes, such as constructing housing for the additional farmers which would be needed. And, of course, a plan of this magnitude, including among other things converting roughly 25,000 or 30,000 acres to farmland, involved extremely high risks. Indeed, although the Doane report recommended that petitioner undertake the plan, its financial estimates, supplemented by management's figures, ultimately persuaded both the majority and the minority interests not to commit such a substantial investment to a venture of this sort. It was not until sometime around May 1968 that the consensus to reject the plan emerged. Petitioner thereafter prepaid $1 million of its bond indebtedness on the next prepayment date, December 31, 1968.

While it may be assumed that other less conservatively run businesses in similar circumstances might not have accumulated quite as large a reserve as did petitioner, we are nevertheless reasonably satisfied on the record before us that petitioner was in fact engaged in a bona fide consideration of possible expansion and that it in good faith, although with perhaps excessive conservatism, retained its liquid funds for that purpose. The proposals for expansion were detailed and concrete, and they initially had the support of the owners of 49½ percent of the stock. Petitioner had to be certain that the proposals had been firmly rejected before distributing its accumulated funds. While the issue was pending, petitioner invested its funds in tax-exempt securities all of which would mature within 1 year thereby

assuring continued liquidity. And, in view of the proposals under consideration, we are satisfied that even if petitioner had liquidated its tax-exempt securities, it would have retained the released funds rather than distribute them in prepayment of its bond indebtedness for 1967 and 1968.

Despite some misgivings, we are persuaded by the totality of the circumstances here that petitioner did not continue its indebtedness for the purpose of purchasing or carrying tax-exempt securities, on account of which it is entitled to deduct the interest expenses incurred thereby in 1967 and 1968 in their full amounts. Because we have decided that section 265(2) is inapplicable to the facts of this case, it is of course unnecessary to decide on the appropriate procedure by which to determine the portion of petitioner's indebtedness allocable to its holdings in tax-exempt securities.

*Decision will be entered under Rule 155.*