BERNARD P. McDONOUGH AND ALMA G. McDONOUGH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
McDonough v. Commissioner
Docket No. 7612-75.
United States Tax Court
T.C. Memo 1977-50; 1977 Tax Ct. Memo LEXIS 392; 36 T.C.M. (CCH) 213; T.C.M. (RIA) 770050; February 28, 1977, Filed *392 Petitioners owned a substantial amount of tax-exempt securities which were purchased for cash, not used as collateral, and held for safe-keeping in bank accounts maintained solely for such securities and interest derived therefrom. They also owned taxable securities held in brokerage margin accounts incurring substantial interest charges thereon. Additionally, petitioners incurred bank loan interest on shortterm borrowings. Held, petitioners have failed to prove that they did not incur or continue indebtedness to purchase or carry tax-exempt securities within the meaning of sec. 265(2); accordingly, a portion of petitioners' interest expense is disallowed. G. Thomas Battle, for the petitioners. David W. Otto, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION
*393 STERRETT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the calendar years 1972 and 1973 in the amounts of $35,638 and $90,286, respectively. Due to concessions [1] by petitioners the sole issue for decision is whether petitioners "incurred or continued" indebtedness to "purchase or carry" tax-exempt securities within the meaning of section 265(2), I.R.C. 1954. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, Bernard P. McDonough (Bernard) and Alma G. McDonough (Alma), husband and wife, resided in Parkersburg, West Virginia at the time the petition herein was filed. Their joint Federal income tax returns for the taxable years 1972 and 1973 utilized the accrual method of accounting and were filed with the Internal Revenue Service Center, Memphis, Tennessee. *394 Bernard and Alma are the sole and equal partners in the partnership, McDonough River Company (the partnership). [2] The partnership filed U.S. partnership returns of income for the calendar years 1972 and 1973, employing the accrual method of accounting, with the Internal Revenue Service Center, Memphis, Tennessee. For convenience and conciseness, unless otherwise indicated, our findings of fact shall refer only to the taxable years 1972 and 1973. In 1972 the partnership owned 14 barges at a cost of $352,800 and adjusted basis of $35,724; in 1973, 13 barges at an adjusted basis of $34,130. All barges were leased, through an agent, to third parties. All activity with respect to the barges, including repairs, maintenance, fees and other costs of operation, which fell upon the lessor, was handled by the agent. The agent was paid for costs incurred *395 and the partnership had no employees. The barge rental activity was profitable and all rental operating costs were paid from barge rental income.
In addition to the barges, the partnership owned a portfolio of securities. The partnership was not in the trade or business of dealing in securities and the portfolio and its income were not utilized in its barge rental operation. The partnership portfolio of securities consisted of stocks, corporate bonds and tax-exempt securities with adjusted basis on the dates indicated as follows: Total Taxable [3]
Stocks
Corporate Bonds
Securities
Tax Exempt
Total
12/31/71
$1,578,487
$1,800,957
$3,379,444
$8,006,504
$ 11,385,948
12/31/72
1,043,952
1,635,864
2,679,816
8,856,387
11,536,203
12/31/73
1,418,780
1,091,200
2,509,980
9,339,010
11,848,990
Partnership sales of securities and income (loss) therefrom are as follows: Sale or
Redemption at
Long-Term
Short-Term 12/31/72
Maturity
Cost
Capital Gain
Capital Gain
Stocks
$ 559,152
$1,082,476
[524,285)
$ 961
Corporate Bonds
1,118,068
996,012
121,440
616
Municipal Bonds
504,000
507,948
(2,298)
(1,650)
12/31/73
Stocks
$1,741,112
$1,475,544
$ 241,838
$23,730
Corporate Bonds
1,381,994
1,407,274
(7,256)
(18,024)
Municipal Bonds
1,646,699
1,656,808
(8,911)
(1,198)
*396 Bernard owned securities individually other than those owned in the partnership, consisting of stocks, corporate bonds and tax-exempt securities with adjusted basis on the dates indicated as follows: Corporate
Total Taxable [4]
Tax-Exempt
Stocks
Bonds
Securities
Securities
Total
12/31/71
$1,735,171
$149,820
$1,884,991
$442,966
$ 2,327,957
12/31/72
1,870,302
535,162
2,405,464
466,776
2,872,240
12/31/73
1,967,497
542,465
2,509,962
741,370
3,251,332
Alma owned securities individually other than those owned in the partnership, consisting of stocks, corporate bonds and tax-exempt securities with adjusted basis on the dates indicated as follows: Corporate
Total Taxable [5]
Tax-Exempt
Stocks
Bonds
Securities
Securities
Total
12/31/71
$ 657,462 $0
$ 657,462
$ 98,727
$ 756,189
12/31/72
640,456
0
640,456
133,968
774,424
12/31/73
670,508
24,118
694,626
115,241
809,867
*397 Petitioners' sales of securities and income (loss) therefrom, excluding partnership sales for 1972 and 1973, are as follows: Sales or Redemption
Long-Term
Short-Term 12/31/72
at Maturity
Cost
Capital Gain
Capital Gain
Stocks
$ 840,421
$215,008
$625,962
$ (549)
Municipal Bonds
225,000
225,990
(990)
12/31/73
Stocks
$ 938,618
$692,441
$235,107
$11,070
Corporate Bonds
762,319
746,425
8,671
7,223
Municipal Bonds
260,473
277,833
(16,903)
(457)
The partnership incurred interest expense of $146,989 and $131,869, respectively; the general categories of interest expense were as follows: Interest on
Margin Account
Bank Loan
Prior Taxes
Interest
Interest
Total
1972
$74,273
$ 71,904
$ 812
$146,989
1973
2,757
109,668
19,504
131,929 [6]
*398 During 1972 and 1973, Bernard paid interest of $39,344 and $73,213, respectively, on individual indebtedness; [7] the categories of interest expense were as follows: Margin Account
Bank Loan
Interest
Interest
Total
1972
$33,594
$ 5,750
$39,344
1973
73,213
0
73,213 This $5,750 of bank loan interest was incurred on a $300,000 note made in October 1971 and repaid in February 1972. On February 2, 1972 petitioners received $309,359 as settlement of a 1958 income tax case. Also, the average annual interest rate charged on debit balances of brokerage margin accounts in 1972 was 6.25 percent and in 1973, 10.10 percent. Bernard and the partnership have maintained one or more separate brokerage margin accounts continuously since 1938 and 1941, respectively, and generally each has had debit balances and interest charged thereon in said accounts. The partnership brokerage margin accounts have always been in the name of Bernard and Alama. Bernard and the partnership each maintained brokerage *399 margin accounts with three brokerage firms: Harris Upham & Company; Bacon Whipple & Company; and Bache & Company. The market value of taxable securities in the brokerage margin accounts maintained by each individually exceeded the respective debit balances, and all the margin accounts had debit balances upon which interest was charged as follows: MONTH-END BALANCES IN BROKERAGE MARGIN ACCOUNTS OF McDONOUGH RIVER COMPANY Bacon
Bache
Harris,
Total
Whipple &
&
Upham &
Co.
Co.
Co.
12/31/71
1,074,812
120,832
1,195,644
1/31/72
998,459
109,803
10,545
1 ,118,807
2/28/72
1,081,653
94,880
10,599
1,187,132
3/31/72
735,673
98,189
10,648
844,510
4/30/72
894,932
82,17 1
10,702
987,805
5/31/72
938,395
79,731
10,757
1,028,883
6/30/72
926,544
79,861
10,815
1,017,220
7/31/72
1,12 1,891
153,678
10,871
1,286,440
8/31/72
1,113,376
214,592
10,930
1,338,898
9/30/72
1,165,593
215,310
10,993
1, 391,896
10/31/72
1,194,378
215,654
11,056
1,421,088
11/30/72
1,193,949
211,529
11,123
1,416,601
12/31/72
917,20 1
125,744
11,188
1,054,133
1/31/73
980,539
135,159
11,257
1,126,955
2/28/73
1,103,664
215,333
11,328
1,330,32 5
3/31/73
750,827
163,744
11,395
925,966
4/30/73
919,186
170,255
11,475
1,100,916
5/31/73
1,243,727
173,322
1 1,554
1,428,603
6/30/73
1,387,343
168,632
11,640
1,567,615
7/31/73
1,405,164
169,720
11,728
1,586,612
8/31/73 1,441,475
139,001
11,827
1,592,303
9/30/73
1,405,243
139,285
11,936
1,556,464
10/31/73
1,261,191
140,005
12,047
1,413,243
11/30/73
174,900
137,083
12,161
324,144
12/31/73
633,834
114,393
12,272
760,499
*400 INTEREST EXPENSE MONTHLY ON BROKERAGE MARGIN ACCOUNTS OF McDONOUGH RIVER COMPANY Bacon,
Bache
Harris,
Whipple &
&
Upham &
Co.
Co.
Co.
January 1972
4,495
696
58
February 1972
4,864
448
53
March 1972
5,506
437
49
April 1972
3,804
446
53
May 1972
3,906
378
55
June 1972
4,923
379
57
July 1972
4,389
484
56
August 1972
5,061
760
58
September 1972
6,383
968
63
October 1972
5,520
1,101
62
November 1972
5,778
1,146
66
December 1972
8,010
1,328
64
Total
71,904
January 1973
4,579
633
69
February 1973
4,926
793
71
March 1973
7,230
1,054
67
April 1973
4,761
1,178
79
May 1973
5,443
1,179
78
June 1973
9,638
1,069
85
July 1973
9,396
1,228
88
August 1973
12,448
1,382
98
September 1973
11,208
1,363
109
October 1973
11,642
1,217
110
November 1973
10,993
1,203
114
December 1973
2,851
1,176
110
Total
109,668
BALANCES IN BROKERAGE MARGIN ACCOUNTS OF B. P. McDONOUGH Bacon,
Bache
Harris,
Total
Whipple &
&
Upham &
Co.
Co.
Co.
12/31/71
76,839
239,652
79,933
396,424
1/31/72
83,718
235,575
79,922
399,215
2/28/72
82, 916
236,399
80,279
399,594
3/31/72
89,543
237,382
80,477
407,402
4/30/72
89,270
232,997
79,671
401,938
5/31/7 2
88,195
234,065
79,378
401,638
6/30/72
88,976
267,888
79,750
436,614
7/31/72
87,997
263,493
78,954
430,444 8/31/72
88,196
350,246
150,298
588,740
9/30/72
89,034
391,956
151,828
632,818
10/31/72
143,851
443,900
152,54 4
740,295
11/30/72
173,922
466,754
150,773
791,449
12/31/72
116,186
682,281
151,458
949,925
1/31/73
115,395
6 44,896
151,235
911,526
2/28/73
97,608
701,910
147,967
947,485
3/31/73
91,532
601,119
133,148
825,799
4/30/73 92,522
609,937
132,349
834,808
5/31/73
107,268
445,971
132,518
685,757
6/30/73
108,525
528,092
133,415
770,03 2
7/31/73
175,547
530,071
128,403
834,021
8/31/73
174,456
239,722
127,384
541,562
9/30/73
333,643
335,218
128 ,181
797,042
10/31/73
332,924
401,877
126,548
861,349
11/30/73
248,229
434,499
126,940
809,668
12/31/73
247,904
496,418
116,707
861,029
*401 INTEREST EXPENSE MONTHLY ON BROKERAGE MARGIN ACCOUNTS OF B. P. McDONOUGH Bacon,
Bache
Harris,
Whipple &
&
Upham &
Co.
Co.
Co.
January 1972
354
1,574
390
February 1972
578
824
357
March 1972
443
982
323
April 1972
918
1,095
354
May 1972
624
1,067
364
June 1972
780
1,144
371
July 1972
654
1,265
364
August 1972
647
1,309
460
September 1972
837
1,709
764
October 1972
708
2,004
715
November 1972
975
2,297
811
December 1972
1,458
3,290
785
Total
8,976
18,560
6,058
33,594
Other Interest
5,750
Total
39,344
January 1973
890
2,765
837
February 1973
883
3,666
856
March 1973
1,060
3,674
794
April 1973
853
4,087
891
May 1973
910
4,364
826
June 1973
1,256
2,970
896
July 1973
1,168
3,815
893
August 1973
2,102
4,303
989
September 1973
1,871
3,356
1,096
October 1973
2,453
2,725
1,107
November 1973
3,076
3,477
1,133
December 1973
2,339
3,718
1,114
Total
18,861
42,920
11,432
73,213
Although it was possible to purchase tax-exempt securities on margin and carry such securities in a brokerage margin account, no tax-exempt securities were *402 used as collateral for any indebtedness nor were they purchased, held or owned in brokerage margin accounts maintained by the partnership or petitioners. Beginning early in 1968 and extending through 1973, all tax-exempt securities owned by petitioners and by the partnership were held in safekeeping by Mellon National Bank and Trust Company, Pittsburgh, Pennsylvania, or by the Chase Manhattan Bank of New York City. All tax-exempt securities purchased by petitioners and the partnership are bearer bonds, and since the 1968 safekeeping arrangement was established, tax-exempt securities purchased have been delivered directly to said banks by brokers or agents making the purchases on behalf of petitioners or the partnership. The banks serviced petitioners' tax-exempt securities accounts by collecting interest as due and depositing the same to the credit of the account of the petitioners or the partnership as the case may be. Funds transferred to these accounts by the servicing banks were subsequently withdrawn by the partnership or petitioners, transferred to the credit of brokers purchasing other tax-exempt securities, or held on deposit pending instructions of petitioners or the *403 partnership. Bernard, Alma and the partnership had income from tax-exempt securities as follows: Partnership
Bernard
Alma
Total
1972
$547,355
$33,236
$7,834
$588,425
1973
567,297
31,724
8,724
607,745
Dividends and taxable interest for petitioners and the partnership are as follows: 1972
Dividends
Interest
Total
Partnership
$ 17,257
$321,529
$338,786
Petitioners
342,347
19,271
361,618
Total
$359,604
$340,800
$700,404
1973
Partnership
$ 64,640
$169,126
$233,766
Petitioners
530,633
45,010
575,643
Total
$595,273
$214,136
$809,409
The combined holdings of tax-exempt securities of the partnership and petitioners (at cost) increased or decreased by year as follows: Year
Increase (Decrease)
1965
- 0 -
1966
$ 467,000
1967
1,186,000
1968
1,398,000
1969
5,606,000
1970
(96,000)
1971
(13,000)
1972
909,000
1973
739,000
For years 1966 through 1969, the source of funds from which these tax-exempt securities were purchased can generally be traced from specific sales of taxable securities. For later years it is not possible to trace the sources of funds of all the *404 acquisitions of tax-exempt securities. On the dates indicated, the adjusted basis of all the assets of the partnership, including its tax-exempt securities; the adjusted basis of all the assets owned individually by Bernard and Alma, including individually owned tax-exempts, but excluding their respective partnership capital accounts; and the total adjusted bases of all assets of the partnership and those owned individually by petitioners were as follows: Total Adjusted Basis
Individually
of Assets of Partnership & Petitioners
Partnership
Bernard
Alma
Bernard
Alma
Grand Total
12/31/71
$11,861,672
$2,440,367
$860,898
$8,371,203
$6,791,734
$ 15,162,937
12/31/72
11,834,081
3,152,513
895,482
9,069,553
6,812,522
15,882,075 [8]
12/31/73
12,838,138
3,829,534
901,272
10,248,603
7,320,341
17,568,944
Securities held by the partnership, or petitioners, did not include material amounts of voting stock of a corporation in which either petitioner held an 80 percent interest, and neither Bernard nor Alma was a dealer in securities within the meaning of *405 section 1.471-5, Income Tax Regs.
The parties have stipulated that for the purposes of this case, the operation of a brokerage margin account was generally as follows: [9]
The margin account as recorded on the broker's books reflects the debit balance, representing the amount loaned to the customer, and the securities held as collateral. The debit balance in the account is increased by the charging of interest by the broker; the charging of a service charge by the broker; the additional purchase of securities by the customer; and the withdrawal of cash by the customer. The debit balance in the account is decreased by the collection by the broker of dividends or interest for the account of the customer; the sale by the customer of securities held by the broker or to be received by him; and the deposit of cash by the customer, either in answer to a call from the broker for additional margin or voluntarily by the customer. When the debit balance is decreased in a margin account, the equity in the account increases. An increase in the value of the collateral would have exactly the same effect. Conversely, an increase in the debit balance or a decrease *406 in the value of the collateral would decrease the equity. Interest charged by the broker on the margin account increases the indebtedness of the taxpayer to the broker. If the broker considers the collateral sufficient security for the increased debt, payment of the interest charged may be postponed. Payment of interest charges, as well as other charges serving to increase the debt, is effected by receipt of amounts by the broker from the taxpayer or from others for the account of the taxpayer. Receipts by the broker are reflected by credits to the taxpayer's account which serve to decrease his debit balance. That is, such credits reflect payments by the taxpayer, thereby reducing his outstanding indebtedness to the broker. In the absence of agreement to the contrary, the credits to the taxpayer's account will be first applied as payment of interest previously charged by the broker. The excess of such credits over interest due will then be applied in payment of the service charge and the principal of the debt. Charges by the broker subsequent to such payments in turn increase the debt. A Margin account therefore, establishes a debtor-creditor relationship between the taxpayer *407 and the broker. The fact that the collateral has a value in excess of that required, thereby creating what is sometimes referred to as a "withdrawal balance" in the taxpayer's favor, reflects a favorable equity status rather than an actual or constructive payment of any kind. That is, such a balance merely enables the taxpayer to increase his debt to the broker without furnishing additional collateral. Such increase of debt results from - (a) the charging of interest by the broker; (b) the charging of a service charge by the broker; (c) the purchase of additional securities by the taxpayer; or (d) the withdrawal of cash by the taxpayer. In cases in which a taxpayer maintains more than one margin account with the same broker, interest charged to one account is not paid by a credit of that amount from another account if the total indebtedness of the taxpayer is in effect increased by the interest charged. Such bookkeeping entries merely serve to transfer the interest charge from one account to another. *408 In his notice of deficiency dated May 19, 1975, respondent disallowed interest expense of the partnership in the amount of $42,628 for the taxable year 1972 and $77,134 for the taxable year 1973. [10] The only interest of the partnership disallowed in part by the Internal Revenue Service for the year 1973 other than interest paid on brokerage margin accounts, was $19,504 [11] of interest recognized upon the repayment of two bank loans in August and December 1973. The first loan was created by the partnership borrowing $325,000 from a bank in February 1973. The proceeds of this loan were used to pay the assessed income tax liabilities and interest thereon. In August 1973 the loan was repaid, along with $10,621 of interest; the primary source of repayment was a second $325,000 loan from a different bank. The second loan was repaid in December 1973, along with interest of $8,833. None of the $325,000 loan proceeds was used to purchase tax-exempt securities. *409 Respondent's explanation of the adjustment was "* * * that the interest on margin account and bank indebtedness was incurred or continued in order to purchase or carry tax-exempt obligations. Therefore the deductions of $72,716 in 1972 and $129,112 in 1973 claimed as interest on brokerage margin accounts and bank loans in the partnership returns are not allowed to the extent of $42,628 in 1972 and $77,134 in 1973 computed as follows:" Year Ended 12/31/72
Total
Bernard
Alma
Total interest expense
$146,989
Less: Interest on prior
income taxes
74,273
Interest expense subject to
allocation
$ 72,716
$36,358
$36,358
Percent of total assets
invested in tax-exempt
obligations [12] *410 53.5595%
63.6869%
Interest expense disallowed
$ 42,628
$19,473
$23,155
Year ended 12/31/73
Total interest expense
$131,869
Less: Interest on prior
taxes
2,757
Interest expense subject
to allocation
$129,112
$64,556
$64,556
Percent of total assets
invested in tax-exempt
obligations [12]
53.3479%
66.1359%
Interest expense disallowed
$ 77,134
$34,439
$42,695
Note: The cents column for certain figures which appear under 12/31/73 is indistinguishable from the record, but this is immaterial to the resolution of this case.
Furthermore in the notice of deficiency, respondent disallowed Bernard's deductions pursuant to section 265(2) of $39,344 in 1972 and $73,213 in 1973 claimed as interest expense to the extent of $21,072 in 1972 and $39,058 in 1973 computed as follows: 12/31/72
12/31/73
Interest expense subject to
allocation
$39,344
$73,213
Percent of total assets invested
in tax-exempt obligations
53.5595%
53.3479%
Interest expense disallowed
$21,072
$39,058
OPINION This Court on numerous occasions has considered the applicability of section 265(2), disallowing a deduction for interest "on indebtedness incurred or continued to purchase or carry" tax-exempt obligations, and ultimately our decisions have rested upon the facts and circumstances of the particular case. The applicable legal principles are now well settled and are concisely stated in Indian Trail Trading Post, Inc.,60 T.C. 497, 500 (1973), *411 affd. 503 F.2d 102 (6th Cir. 1974). * * * the statutory disallowance is not activated merely by the simultaneous existence of an indebtedness and the holding of tax-exempt obligations. * * * Thus, a taxpayer is not automatically required to liquidate such obligations to obtain needed funds rather than retain such obligations and obtain those funds by way of independent borrowing. * * * On the other hand, it is equally clear that a taxpayer cannot insulate himself from the prohibition of section 265(2) by merely juggling the use of his available assets so as to create a surface sanitation of the indebtedness from the acquisition or holding of the tax-exempt obligations. * * * The touchstone for decision is the purpose of the taxpayer in incurring or continuing the indebtedness and the burden of proof is on the petitioner. * * * As we pointed out in John E. Leslie,50 T.C. 11, 20-21 (1968), reversed on other grounds 413 F.2d 636 (C.A. 2, 1969): *412 The finding of the taxpayer's purpose does not depend solely upon looking into his mind and learning what he was thinking; although his intentions are relevant, purpose may be inferred from his conduct and from the circumstances that confronted him. * * * To these elements may be added the further element of timing, which "can be just as important to the taxpayer as it is to the athlete or comedian." * * * Expressed in another way, the deduction will be barred if there is "a sufficiently direct relationship" between the incurring or continuing of the indebtedness and the acquisition or holding of the tax-exempt obligations. * * * In essence, the existence of "a sufficiently direct relationship" is a step along the path leading to the determination of the taxpayer's purpose within the Leslie frame of reference. [Citations omitted] See also Swenson Land & Cattle Co.,64 T.C. 686, 695-6 (1975); Handy Button Machine Co.,61 T.C. 846, 851-2 (1974). In *413 applying these principles to the facts of the instant case, we will consider, separately, interest incurred on the bank loans and brokerage margin accounts. Interest expense of the partnership and petitioners under these categories will be aggregated unless otherwise specifically stated. Petitioners on brief recognize that the key to this case is our determination of the purpose of the indebtedness incurred by them. They submit that the record is clear that the direct purpose of the margin account indebtedness was to permit the acquisition of taxable securities having a market value in excess of cash deposited in the margin accounts. Brokerage margin accounts have been maintained since 1938 by petitioners, since 1941 by the partnership, while tax-exempt securities were first purchased in 1966, more than 25 years after petitioners first purchased taxable securities on margin. This history shows, in light of the fact that tax-exempt securities were purchased for cash and segregated from the brokerage margin accounts, an ordinary and customary method used by petitioners in pursuing taxable investments, separate and apart from the tax-exempt securities purchased and held by petitioners *414 during the years in issue. Furthermore, petitioners contend that the very nature of a brokerage margin account is that the indebtedness relates solely to the securities held by the broker. Margin account debit balances fluctuate with the activity of the securities purchased and sold and do not remain a constant fixed loan. Also, petitioners argue that the record does not indicate that the liquidation of tax-exempt securities would have lowered the margin indebtedness; under the aforenoted history of the margin account debit balances, Bernard, with more cash available, would probably have purchased more taxable securities on margin. With respect to interest incurred on bank loans, petitioners contend all such loans were on a short-term basis and had no direct or indirect relationship to tax-exempt securities purchased or held. The indebtedness incurred by the partnership in 1973 was for the payment of assessed income tax liabilities and petitioners argue that short-term borrowing was more appropriate then to identify and isolate tax-exempt securities of an equivalent amount, especially when such securities were not freely marketable and entrusted for safekeeping by the two aforesaid *415 banks. Bernard's indebtedness repaid in 1972 was apparently in anticipation of an expected income tax refund and such anticipatory receipt does not support an inference that the indebtedness was incurred for the purpose of purchasing or carrying tax-exempt securities. Finally, petitioners conclude that although it can be argued that equal amounts of cash could have been obtained from liquidating tax-exempt securities owned by them, to disallow the interest on the bank borrowing under the circumstances of this case would result in a mechanical test which has not been favored by the courts in the application of section 265(2). After careful scrutiny of the entire record we are of the opinion that petitioners have failed to overcome the presumption of validity of respondent's determinations of deficiencies. See Israelson v. United States,367 F.Supp. 1104, 1107 (D. Md. 1973) affd. without opinion 508 F.2d 838 (4th Cir. 1974). On the record in this case, a finding of the absence of the prohibited purpose of section 265(2) would be based on pure conjecture. We are cognizant of the fact that *416 under section 265(2) the "* * * circumstances may be such as to make it difficult or impossible, without fault on the part of the taxpayer, to prove a material fact necessary to establish * * *" the deduction. Bishop v. Commissioner,342 F.2d 757, 759 (6th Cir. 1965). However this does not relieve petitioners of their burden. As previously stated by petitioner and conceded, "* * * the pivotal inquiry here is whether there was a 'purposive connection' or a 'sufficiently direct relationship' between the continuation * * *" of petitioners' indebtedness and their ownership of tax-exempt securities. Swenson Land & Cattle Co.,supra at 696. In view of this admitted rule of law we are perplexed by the failure of Bernard to testify. Conceivably his testimony could have altered our view of this case. However, petitioners were represented by competent counsel and in such circumstances it is not the province of the Court to second-guess. Nonetheless, we do note our holding in Wichita Terminal Elevator Co.,6 T.C. 1158, 1165 (1946) to the effect "that *417 the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." The record is inconclusive to establish petitioners' (purposes) in regard to the margin account indebtedness. Although there is a lengthy history of taxable securities purchased on margin prior to the acquisition of tax-exempt securities for cash in 1966, we are unable to infer from the facts whether their intent remained unchanged subsequent to their first purchase of tax-exempt securities. The fact that tax-exempt securities were purchased for cash, not used as collateral and segregated from the securities on margin is not determinative. Mere juggling of assets to create "a surface sanitation" will not insulate petitioners from section 265(2). Moreover in substance, we are unable to differentiate a margin account debit balance from a revolving demand bank loan in which securities are pledged to the bank with income therefrom payable to the bank to cover, in part, interest and principal payments due on such loan. Similarly, because of lack of testimony we are unable to find the absence of the *418 prohibited purpose with respect to the bank loans. We have no evidence concerning the amount of cash and liquid assets of petitioners for the years in issue. In light of the substantial amount of proceeds received from sales or redemptions at maturity of tax-exempt securities for the years in issue, the evidence presented does not show that tax-exempt securities were unmarketable or incapable of liquidation to meet petitioners' short-term borrowing needs. Finally, we believe that respondent makes a fair point when he cites as significant the fact that over 75 percent of the total partnership assets and between 16 to 22 percent of the petitioners' individual holdings were invested in tax-exempt securities. Such a substantial investment in tax-exempt securities makes it more difficult to accept an argument that in effect the relationship between loans and tax-exempt securities was merely happenstance. In short, on the basis of the entire record, and our awareness that the result under section 265(2) should not be based upon a mechnical test, petitioners have not presented sufficient evidence to rebut the presumption of correctness of respondent's determinations of deficiencies. *419 Compare Edmund F. Ball,54 T.C. 1200 (1970); Batten v. United States,322 F.Supp. 629 (E.D. Va. 1971). As petitioners admit and take no exception to respondent's method of determining the amount of interest to be disallowed in the event we find for respondent, Decision will be entered for the Respondent. Footnotes
1. Petitioners concede the adjustments in the notice of deficiency increasing dividend income in the amount of $4,720 for each of the taxable years in issue and increasing interest income by $1,437 in 1973.↩
2. Alma is not an active participant in the partnership. Since May 1962, Bernard has held a power of attorney to sign for his wife and execute documents necessary to the conduct of their, or her affairs. During 1972 and 1973 all decisions with respect to the partnership's operations and investment portfolio were made by Bernard.↩
3. All the partnership's taxable securities were held in brokerage margin accounts.↩
4. These amounts were held in brokerage margin accounts and outside margin accounts as follows: ↩
Outside
On Margin
Margin
Total
12/31/71
$1,337,392
$547,599
$1,884,991
12/31/72
1,872,301
533,165
2,405,466
12/31/73
1,943,691
566,271
2,509,962
5. All these taxable securities were held outside the brokerage margin accounts.↩
6. The parties have stipulated this schedule totaled $131,929; however, the notice of deficiency showed such total as $131,869 as did the partnership's U.S. partnership return of income. Bank loan interest for 1973 is stipulated to be comprised of $10,621 and $8,833, totalling $19,454 instead of $19,504 shown on said schedule.↩
7. Alma maintained no individual brokerage margin accounts, had no indebtedness, and incurred no individual interest expense outside of the partnership.↩
8. Discrepancy of $1.00 in total caused by rounding.↩
9. The 1975 Fact Book published by the New York Stock Exchange, shows that for the months indicated the number of brokerage margin accounts, the margin debt (debit balance), and collateral securing the margin debt of the customers of the Exchange members were as follows: ↩
Number of
Collateral
Accounts
Margin Debt
Securing Debt
December 1971
675,000
$5,400,000,000
$17,660,000,000
December 1972
750,000
7,900,000,000
22,370,000,000
December 1973
680,000
5,050,000,000
13,390,000,000
10. The interest deduction on prior income taxes is not in dispute. The parties agree and recognize that the liability for income taxes and the resultant interest thereon is correctly a liability of the individual parties, rather than the partnership, but that interest is allowable in full in any event. Accordingly, disallowed partnership interest expense increases petitioners' distributive share of partnership ordinary income.↩
11. See fn. 6, supra. Also, although the parties stipulated this amount was the only other interest disallowed, in part, for 1972 and 1973, the notice of deficiency disallowed $812 of bank interest for 1972. This omission of $812 must be an oversight as respondent refers to that sum still being in issue on brief. In light of our opinion, infra,↩ the $812 shall be included in interest expense subject to allocation.
12. Interest Expense Allocation Revenue Procedure 72-18
B. P.
Alma
Total
McDough
McDough
Year Ended 12/31/72
Average Assets as Adjusted: McDonough River Co. - Exhibit A-2
$11,847,876.58
$5,923,938.29
$5,923,938.29
B. P. McDonough - Exhibit A-3
2,796,439.95
2,796,439.95
Alma G. McDonough - Exhibit A-3
878,189.87
878,189.87
Totals - Average Assets
$15,522,506.40
$8,720,378.24
$6,802,128.16
Average Investment - Tax Exempts:
McDonough River Co. - Exhibit A-2
$ 8,431,446.39
$4,215,723.20
$4,215,723.19
B. P. McDonough - Exhibit A-3
454,871.55
454,871.55
Alma G. McDonough - Exhibit A-3
116,347.75
116,347.75
Totals
$ 9,002,665.69
$4,670,594.75
$4,332,070.94
Percent of Tax Exempt to
Total Assets
53.5595%
63.6869%
Year Ended 12/31/73
Average Assets as Adjusted: McDonough River Co. - Exhibit A-2
$12,336,109.90
$6,168,054.95
$6,168,054.95
B. P. McDonough - Exhibit A-3
3,491,023.41
3,491,023.41
Alma G. McDonough - Exhibit A-3
898,377.07
898,377.07
Total Average Assets
$16,725,510.38
$9,659,078.36
$7,066,432.02
Average Investment - Tax Exempts:
McDonough River Co. - Exhibit A-2
$ 9,097,699.10
$4,548,849.55
$4,548,849.55
B. P. McDonough - Exhibit A-3
604,073.50
604,073.50
Alma G. McDonough - Exhibit A-3
124,605.00
124,605.00
Totals
$ 9,826,377.60
$5,152,923.05
$4,673,454.55
Percent of Tax Exempt to
Total Assets
53.3479%
66.1359%
Exhibit A-2
1/1/72
12/31/72
12/31/73
Total Assets - Line 13, Form 1065
$11,771,365.84
$11,770,617.72
$12,266,073.63
Add: Prepaid W. Va. I.T.
30,136.80
63,463.60
62,291.
Prepaid Federal I.T.
60,169.20
509,773.
Total Assets as Adjusted
$11,861,671.84
$11,834,081.32
$12,838,138.
Average Balance Average Balances represent one-half of the sum of the beginning and ending balances.
*↩
$11,847,876.58
$12,336,109.
Partners Interest
B. P. McDonough - 50%
5,923,938.29
6,168,054.
Alma McDonough - 50%
5,923,938.29
6,168,054.
Investment - Tax Exempt Obligations
Line 4(b) - Form 1065
$ 8,006,504.83
$ 8,856,387.95
$ 9,339,010.
Average Investment *
$ 8,431,446.39
$ 9,097,699.
Partners Interest
B. P. McDonough - 50%
$4,215,723.20
$ 4,548,849.
Alma McDonough - 50%
$ 4,215,723.19
$ 4,548,849.
Exhibit A-3
B. P. McDonough
Total Assets per Books
$ 2,500,366.77
$ 3,202,513.12
$ 3,458,642.21
Less: Account 199 - Pledges
60,000.00
50,000.00
Add: A/R McDonough River Co. Acct. 260
370,891.48
Total Assets as Adjusted
$ 2,440,366.77
$ 3,152,513.12
$ 3,829,533.69
Average Balance *
$ 2,796,439.95
$ 3,491,023.41
Investment - Tax Exempt Obligations
$ 442,966.80
$ 466,776.30
$ 741,370.70
Average Investment *
$ 454,871.55
$ 604,073.50
Alma G. McDonough
Total Assets per Books
$ 860,897.82
$ 887,527.44
$ 880,723.21
Add: A/R Marmac Corp. Acct. 262
7,954.47
20,549.01
Total Assets as Adjusted
$ 860,897.82
$ 895,481.91
$ 901,272.22
Average Balance *
$ 878,189.87
$ 898,377.07
Investment - Tax Exempt Obligations
$ 98,727.00
$ 133,968.50
$ 115,241.50
Average Investment *
$ 116,347.75
$ 124,605.00